[Civ. No. 13833. Fourth Dist., Div. Two. May 9, 1975.]

EARL R. HALE et al., Plaintiffs and Appellants, v.
GEORGE A. HORMEL & COMPANY et al.,
Defendants and Respondents.

## Counsel

Howser, Gertner & Brown, Robertson, Howser & Garland, Richard A. Brown, Jr., and Daniel P. Broderick for Plaintiffs and Appellants.

Tuttle & Taylor, Antonio Rossmann, Kindel & Anderson and Edward J. Wallin for Defendants and Respondents.

## Opinion

**KERRIGAN, J.**—Earl Hale and his wife ("Hale") entered into a written agreement with Universal Marketing Enterprises Co. ("Universal") whereby Universal agreed to sell Hale 39 coin-operated vending machines for $25,000 and to find Hale suitable sites or locations for the machines in the Coachella Valley area (Palm Springs and environs). The machines were to be utilized to dispense 8-ounce cans of Welch's fruit drinks and delivery was to be accomplished within 90 days.

Unfortunately, Hale paid the entire purchase price before receiving any machines. Universal's president advanced excuse after excuse for his firm's failure to effect delivery within the contract period or thereafter. Ultimately, Hale demanded the return of his investment and $5,000 was repaid. When the balance was not forthcoming, Hale sued Universal and its president and sole shareholder ("Newhope") for $20,000 for breach of contract and for general and punitive damages for fraud. In the same suit, in separate counts, Hale also sought damages for negligent misrepresentation from Welch Foods, Inc. ("Welch"), the national manufacturer of Welch's fruit products, and George A. Hormel & Co. ("Hormel"), Welch's west coast distributor, on the basis that Welch permitted Universal to use its name in advertising the machines and that Hormel's regional manager highly recommended Universal to Hale before he signed the contract and paid the purchase price.

Hormel and Welch filed motions for summary judgment. Summary judgments were granted and Hale appeals. Hale maintains that there were triable issues of fact which could not be summarily resolved.

We have determined that the trial court acted with propriety in granting the summary judgments inasmuch as no material misrepresentations were made by agents of Welch or Hormel and the court properly concluded that Hale could not establish a cause of action for negligent misrepresentation against either firm.

FACTS

In March 1973, Hale saw some advertisements in the Los Angeles Times directed to readers who might be interested in becoming part-time distributors of Welch's drinks. The ad had been placed by Universal. In response to his telephone request, Hale was sent a packet of written materials by Universal. Included in the materials was a list of references, including Universal's attorney, Universal's bank and "Hormel Meats, Adam Brown, Regional Manager, Foods Division." Three phone numbers were listed for Brown.

Hale called Brown and the following conversation took place:[1]

"Q: Do you do business with Universal Marketing Enterprises Co.?

---

[1]The factual material contained herein has been taken from the affidavits in support of, and in opposition to, the motions for summary judgment and from Hale's answers to written interrogatories which were filed prior to the hearing on the motions.

"A: Yes.

"Q: Are they a large account with you, and how many cases of Welch's 8-ounce can drink do they buy from you per month?

"A: Well, that would be difficult to answer on the phone at this time, but they are a new company and they do buy a lot of cases from us.

"Q: Do you feel they are a reputable company?

"A: Yes. They pay their bills and we have no problems with them.

"Q: How does Hormel fit in with Universal Marketing Enterprises Co.?

"A: We are the distributors of Welch's vending can items and sell the product to Universal Marketing Enterprises Co. so that they can solicit distributors such as you would be.

"Q: Do you think that Universal Marketing Enterprises Co. is a good company?

"A: Oh, yes. They are just getting started, but with Welch's products, they have great promise."

Hale was contacted by Newhope, Universal's president, and a meeting was arranged in the Hale home in Costa Mesa on March 29. Newhope represented that the opportunity to purchase a Welch distributorship was made possible by the recent development by Welch of a new 8-ounce vending can. Samples of these cans bearing the Welch inscription were displayed. At the end of the conversation, Hale signed an agreement to purchase 300 cases of Welch's drinks and 39 vending machines and paid Newhope $5,000.

On April 24, Hale paid Newhope the balance of the purchase price of the machines ($20,665).

In the next four-five weeks, Newhope assured Hale of an early delivery date.

Around June 1, Hale saw some ads in the Desert Sun run by National Consolidated Beverage Company of Oakland (Hale had moved to the

Palm Springs area). Hale contacted National and feigned interest in the ad. A representative of the firm visited Hale and stated that his company was selling vending machines for the purpose of dispensing Welch's products. National's representative gave Hale a copy of the Hormel price list and a sample of Welch's vending machine cans. National's representative offered Hale an exclusive territory—the same territory that Hale was planning to operate in.[2]

Hale contacted Newhope and told him National was offering an exclusive territory for the dispensing of Welch's products. In turn, Newhope contacted Adam Brown of Hormel and informed him that National was promising exclusive territories. Brown spoke to Hale and promised to contact Welch for the purpose of stopping National from making misleading representations.

By mid-June, Hale determined that Universal was incapable of furnishing him with the vending machines. He demanded his money back and (in September) Universal repaid him $5,000, and Universal's attorneys promised to furnish a confession of judgment for the balance. Later when Hale attempted to contact Brown at Hormel, he was told that Brown had been transferred to Colorado and that Brown may have been "overly enthusiastic" in regard to Universal's prospects.

When the balance due him from Universal remained unpaid and the confession was not forthcoming, Hale filed suit against Universal, Newhope, Welch and Hormel in October.

Hormel and Welch submitted interrogatories to Hale and, in December, filed answers to the complaint.

In February 1974, Welch and Hormel moved for summary judgment.

Welch's motion for summary judgment was supported by the affidavit of its legal director which may be summarized as follows: Welch produces canned fruit drinks that can be sold through vending machines; Welch does not sell vending machines or direct or control the efforts of vending machine dealers or operators; Welch designated Hormel as its exclusive agent for the marketing of fruit drinks for use in vending machines; in accordance with its marketing agreement with Hormel, a purchaser of Welch's fruit drinks in the vending machine trade must deal with Hormel and may not deal directly with Welch; the marketing

---

[2]Universal had *not* represented that Hale's territory was to be exclusive.

agreement prohibits Hormel from taking any action which would infringe upon the Welch trademark; Welch has no office in Los Angeles nor did it ever employ Adam Brown; Welch has no connection with Universal or Newhope and no contracts or agreements with that corporation or Newhope; Welch never consented to nor approved any advertising conducted by Newhope or Universal; Welch never received any inquiries regarding the trustworthiness, reputation or financial responsibility of Universal, Newhope or their associates; Welch never made any representation as to the trustworthiness, financial responsibility or reputation of Universal or Newhope; Welch never authorized Universal or Newhope to use the Welch name in advertising distributorships; the only time that Welch had been requested by Universal to use the Welch name in connection with Universal's advertising was in July 1973; Universal was advised that Welch did not and would not authorize the use of its name in Universal's advertising; the only contact that Welch ever had with Hale was when it received a letter dated May 29, 1973 (after Hale had contracted with Universal) requesting promotional assistance for the marketing of Welch's fruit drinks in connection with Hale's contemplated vending machine operation; that Hale was informed by letter that Hormel was Welch's exclusive distributor of products for the vending machine trade and that Welch had no control over vending promotions.

Hormel's motion for summary judgment was supported by the affidavit of its district manager for the grocery products division and contained the following averments: his area of responsibility included the sale of vending can products manufactured by Welch; he was informed of Hale's claim that Universal placed newspaper ads referring to Welch's products with the agreement and consent of Hormel; he stated that Hormel never at any time consented to the use of the Welch name in advertising by Universal; under the Welch-Hormel west coast distributorship agreement, only Welch has the power to consent to the use of its name in advertising; Hormel had never vouched for the financial stability, integrity or honesty of any of its customers; while Universal had purchased Welch's vending can products (grape juice, apple-grape juice, orange juice and fruit punch) from Hormel prior to Hale's investment, Hormel's records indicated that Universal paid for the merchandise upon receipt and that Universal was not indebted to Hormel; and that the statement attributed to Adam Brown (Hormel's former district manager) to the effect that Universal had paid its bills to Hormel was a true statement.

In opposition to the two motions, Hale relied on his answers to the interrogatories and the affidavit of Universal's attorney. The attorney's affidavit contained the following declarations: in July 1973 (after execution of the Universal-Hale contract), Universal informed him that the Los Angeles Times would not run Universal ads using the Welch name unless Universal furnished the paper with written authorization allowing it to do so; he (affiant) phoned Welch's sales director in New York concerning the problem and the latter said he would discuss it with Newhope when Newhope visited New York the following week; in late July, Newhope requested that he call Welch's New York house counsel concerning written authorization to use the Welch name in Universal advertising; he phoned Welch's legal director but the latter refused to furnish any written authorization to use the Welch name in Universal advertising; Welch's attorney said that it would be a problem giving written authorization because he (Welch's house counsel) had just learned on Newhope's recent visit to New York that Universal had not delivered a single vending machine to any distributor and that while Welch liked the free advertising, it would not give written authorization for the use of its name in Universal advertising.

## Issue and Argument

In urging that the trial court erred in summarily disposing of his action against Hormel and Welch, Hale submits the following argument: Welch and Hormel were engaged in a marketing venture to sell Welch's products; Hormel permitted its name to be used as a reference in Universal's prospectus; Hormel furnished Universal with its price lists; Hormel's district manager (Brown) made statements before Hale invested in Universal's vending machines to the effect that Universal was a good, solid, reputable company with great prospects when in truth and in fact Universal lacked business experience and was financially unsound; Hormel had a duty to investigate Universal before recommending it as a financially sound firm; the representations led Hale to believe that Universal was part of the Hormel-Welch marketing system; by reason of the aforesaid representations and conduct on Hormel's part, Hale invested in the machines; as to Welch, Hale claims that its name was being used in Universal's ads and Welch would benefit from the sale of distributorships through Universal inasmuch as Universal was marketing Welch's products; Welch accepted the benefits of the free advertising promoting the sale of its products; consequently, it had the duty to investigate Universal's business and financial background before allowing Universal to use its name in advertising; Welch's failure, and the

failure of its distributor (Hormel), to investigate Universal resulted in Hale's loss of his investment.

## SUMMARY JUDGMENT PROCEDURE

The standard to be applied by the trial court in ruling on a motion for summary judgment, as set forth in a recent opinion of this court, is as follows: "When a party moves for summary judgment [under section 437c of the Code of Civil Procedure], the trial court's function is to determine whether the case presents a triable issue of fact—issue finding, not issue determination, is the court's function at this stage in the proceedings. [Citations.] To be entitled to summary judgment the moving party must support his motion with affidavits containing facts sufficient to entitle him to judgment [citation], provided, of course, that the other party does not introduce counteraffidavits sufficient to present a triable issue of fact. [Citation.] The facts set forth in the movant's affidavits must be evidentiary in quality, and within the personal knowledge of affiants who could testify competently thereto. [Citation.]... [¶] Both California courts and Legislatures have grappled with the question of what kind of standard to use to test the sufficiency of parties' affidavits in deciding whether or not to grant a motion for summary judgment. The inability of the courts to come up with a satisfactorily concrete test led the Legislature to amend section 437c of the Code of Civil Procedure in 1974 and define a statutory rule of construction. (Stats. 1973, ch. 366, effective Jan. 1, 1974.) [¶] The new statute reads, in relevant part: 'In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the admissible evidence set forth in the papers and all inferences reasonably deducible from such evidence except summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (Code Civ. Proc., § 437c.) Restated, a court must look to all facts presented in the parties' affidavits in determining whether or not an issue is triable; the court is not limited to a search for 'facts' regarding a particular issue but may draw inferences regarding that issue from related facts set forth in the affidavits. This rule seems to avoid the artificial distinction which courts were previously required to draw between ultimate and evidentiary facts." (*People* v. *Rath Packing Co.,* 44 Cal.App.3d 56, 61-64 [118 Cal.Rptr. 438].)

Hale's argument that factual issues were presented precluding a summary disposition of his case assumes that misrepresentations about

Universal were made by Hormel's regional manager for which both Hormel and Welch are vicariously liable because of the close business relationship existing between the three firms. At the heart of Hale's argument lies the contention that Brown made false representations. Thus, before the issue of vicarious liability as an agent or endorser arises, Hale must show that Brown's remarks amounted to misrepresentations under the law.

Applying the aforestated summary judgment standard to the instant case, we find that there is little disagreement between the parties as to *what* Brown said (e.g., no material facts in this regard are in dispute). What the parties do contest is whether Brown's statements constituted, as a matter of law, a misrepresentation to which liability for plaintiff's loss could attach. This issue presents a question of law. (See *Burke Concrete Accessories, Inc.* v. *Superior Court,* 8 Cal.App.3d 773 [87 Cal.Rptr. 619]; *Goldstein* v. *Hoffman,* 213 Cal.App.2d 803 [29 Cal.Rptr. 334].)

## NEGLIGENT MISREPRESENTATION

The modern law of misrepresentation evolved from the action on the case of deceit. Closely allied to the action for breach of warranty, deceit ordinarily was only available to a party to a business transaction; that is, where a contractual or fiduciary relationship (privity) existed. But in 1789, in *Pasley* v. *Freeman,* 100 Eng.Rep. 450, it was held that one who fraudulently induced a third party to extend credit to a person known to be untrustworthy was liable to the defrauded party. Deceit, as a distinct tort, thus came into being, independent of any contractual relationship. (1 Harper & James, Torts (1956) § 7.1, p. 527.)

Generally, the type of conduct which subjects one to liability for fraud or deceit consists of (1) a false representation (2) fraudulently made (3) with the intention of inducing another to rely thereon; if such misrepresentation (4) induces reliance (5) and the reliance is justified and (6) causes damage, the defendant is liable. (*Nathanson* v. *Murphy,* 132 Cal.App.2d 363 [282 P.2d 174].) Only *fraudulent* representations are included; in other words, there must be "scienter"—an intentional, conscious misrepresentation.

By reason of the scienter requirement, the House of Lords held in 1889 that no action would lie for negligent misrepresentation. In *Peek* v. *Derry,* 14 App.Cas. 337, the directors of a tramway company issued a prospectus to induce the public to subscribe for stock; the prospectus

contained the following unqualified statement: ". . . the company has the right to use steam or mechanical motive power instead of horses. . . ."; in fact, the company had no such right inasmuch as the government permitted the use of steam as a motive power only if the company first obtained governmental consent and the company had never obtained such consent; the evidence indicated that the stock was worth less than if the company had enjoyed the right to use steam; the evidence also indicated that the directors all believed the statement to be true, even though they had no reasonable ground for such belief; Peek, a stockholder who had purchased shares on the faith of the prospectus, sued the directors for deceit in making the misrepresentations; while Peek's complaint was framed as an action on the case for deceit (as distinguished from negligence), the holding of the House of Lords was interpreted time after time during the ensuing years for the proposition that no action whatever would lie for negligent misrepresentation but only for an intentional, conscious misrepresentation.

However, in 1922, Judge Cardozo authored an opinion holding that in financial transaction cases an action for negligent misrepresentation would lie against persons who furnished false information which was relied on by the plaintiff. (*Glanzer* v. *Shepard,* 233 N.Y. 236 [135 N.E. 275, 23 A.L.R. 1425].) In *Glanzer,* the defendant—a public weigher—furnished an erroneous weight certificate; as a result, the plaintiff overpaid the seller for a quantity of beans; the court held that where the defendant negligently, though in good faith, furnished an erroneous certificate, he was liable for misrepresentation.

A few years later, Cardozo again considered the liability of persons engaged in the business of supplying information for use in financial transactions whose information, through inadvertence or carelessness, proved to be wrong, and as a result of which another person sustained a loss in extending credit; Cardozo indicated that when an accountant certified as a fact that the audit corresponded with the books of the trader who was seeking financial credit, the duty of the accountant was not merely to use care with respect to creditors who might rely on the balance sheet in extending credit to the trader; the accountant's duty was to be *accurate.* (*Ultramares Corporation* v. *Touche,* 255 N.Y. 170 [174 N.E. 441, 74 A.L.R. 1139]; see also Green, *The Duty to Give Accurate Information,* 12 U.C.L.A. L.Rev. 464.)

Thirty years later, the House of Lords followed Cardozo's lead in holding an action for negligent misrepresentation would lie in connec-

tion with a financial transaction. In *Hedley Byrne & Co.* v. *Heller & Partners Ltd.* [1964] A.C. 465, plaintiff's bank, without naming the plaintiff but at his request, asked the defendant-bank by telephone whether one of defendant's customers could afford a £9,000 advertising contract; three months later, plaintiff's bank asked by letter, again on the plaintiff's behalf, whether the customer could carry an advertising contract of £100,000 per annum; disclaiming responsibility and noting that the value of the contract was unusually high, the defendant-bank replied that its customer was "considered good for its normal business engagements"; after the customer's financial collapse, the plaintiff sued for fraud, later shifting to a theory of negligent misrepresentation; the trial court found the defendant negligent in implying that the customer was in a stronger financial position than it knew him to be, but held for the defendant on the ground that negligent misrepresentation producing financial loss was not actionable in the absence of a contract or fiduciary obligation; on appeal, the judgment was affirmed on the basis of the defendant's disclaimer of responsibility; nevertheless, the Lords stated in dicta that a party could be liable for pecuniary harm resulting from negligent misrepresentation.

Most American courts now recognize liability for negligent misrepresentation. ■ In California, negligent misrepresentation is given statutory recognition as a form of deceit: Under section 1710, subdivision 2, of the Civil Code, it is the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; under section 1572, subdivision 2, of the Civil Code, it is the positive assertion by a contracting party, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true.

Hence, the broad statements employed in the earlier cases that "scienter" is an element of every cause of action for deceit, and that an intent to deceive is essential, are untrue since neither is a requisite of negligent misrepresentation. (*Gagne* v. *Bertran,* 43 Cal.2d 481, 487-488 [275 P.2d 15]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 481-482, pp. 2740-2744.)

California courts have been liberal in allowing recovery against persons providing false information causing injury, loss or damages under the theories of deceit and negligence.

In *Gagne* v. *Bertran, supra,* 43 Cal.2d 481, plaintiffs had bargained for some lots but before completing the deal decided that they wanted to know the depth of the "fill" in the lots; plaintiffs employed defendant, who held himself out as a tester, to make fill tests and give them a report; defendant made the tests and reported there was no evidence of fill beneath the depth of 12-16 inches from the surface and that the condition was "normal" for an 18-inch foundation; plaintiffs completed escrow on the basis of defendant's report and contracted for the construction of the foundation, subject to additional charges if unforeseen conditions were encountered; fill was discovered to depths of 3-6 feet and plaintiffs were subjected to additional costs of some $3,000; they then sought recovery from defendant on theories of warranty, deceit and negligence; the trial court sustained their claim on all three theories; on review, the Supreme Court held that there was no basis of liability in warranty but that defendant was liable for deceit and negligence.

In *Weaver* v. *Bank of America,* 59 Cal.2d 428 [30 Cal.Rptr. 4, 380 P.2d 644], the court considered the liability of a bank to a depositor for not honoring her check which resulted in the depositor's arrest and imprisonment under a criminal charge; the court held the bank was liable on the theory it had a duty to honor checks on the depositor's account so long as adequate funds were in her account and its dishonor of the check constituted a breach of duty.

In *Hanberry* v. *Hearst Corp.,* 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173], the trial court sustained a general demurrer to four causes of action against the Hearst Corporation and entered a judgment of dismissal. In her action against Hearst, plaintiff alleged she purchased a pair of shoes at a retail store; the shoes were defective in manufacture and design and had a low co-efficient of friction on vinyl; she was unaware of the defect and in wearing the shoes on the same day she purchased them, she slipped on the vinyl floor of her kitchen and sustained personal injuries; Hearst publishes Good Housekeeping; Good Housekeeping advertises products as meeting the "Good Housekeeping's Consumers' Guaranty Seal;" the shoes she purchased were so advertised in Good Housekeeping; with respect to the seal, Good Housekeeping stated: "This is Good Housekeeping's Consumers' Guaranty" and "We satisfy ourselves that products advertised in Good Housekeeping are good ones and that the advertising claims made for them in our magazine are truthful;" the seal itself contained the promise: "If the product . . . is defective, Good Housekeeping guarantees replacement or refund to consumer;" based on the Good Housekeeping advertisement,

she purchased the shoes; Hearst made no examination, test or inspection of the shoes or if the tests were done, they were done in a careless and negligent manner; Hearst's issuance of its seal and certificate endorsing the shoes was not warranted by the information it possessed; in addition to the warranty allegations, plaintiff sought to recover on the theories of negligent misrepresentation and intentional fraud; in reversing the judgment of dismissal in favor of Hearst, the reviewing court rejected the contention that plaintiff stated a cause of action in warranty or strict liability but held that one who endorses a product for his own economic gain and for the purpose of encouraging and inducing the public to buy it may be liable to a purchaser who, relying on the endorsement, buys the product and is injured because it is defective and not as represented in the endorsement; the court based its holding on public policy considerations (see discussion, *infra*) and concluded that Hearst had a duty to exercise ordinary care in issuing its seal and certificate; the complaint indicated that plaintiff's shoes were purchased without test, examination or inspection of the shoes or if tested, the inspection and examination were done in a careless and negligent manner; if either allegation was true, Hearst had violated its duty of care to the plaintiff; and the issuance of a seal and certificate with respect to the shoes amounted to negligent misrepresentation.

██ Hale relies primarily on *Hearst* for the proposition he stated a good cause of action for negligent misrepresentation against Welch and Hormel. The argument is premised on the proposition that the two firms had a duty to investigate Universal before permitting it to use their names and before recommending it as a financially responsible firm.

But it just is not enough for Hale to charge that Welch and Hormel owed him the "duty" to investigate Universal. The mere assertion of liability begs the real question: whether plaintiff's interests are entitled to legal protection against the defendants' conduct. In other words, whether a duty exists depends on those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. (*Dillon v. Legg*, 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

The policy factors to be considered in determining whether a duty exists have been judicially defined as follows: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the

policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian,* 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Biakanja* v. *Irving,* 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; *Hanberry* v. *Hearst Corp., supra,* 276 Cal.App.2d 680, 685.)

Applying the foregoing policy considerations to this case, the following conclusions appear apparent: As to the "foreseeability of harm" factor, neither Welch nor Hormel could have reasonably foreseen that their activity in selling juices to Universal would have caused Hale to part with $25,000 in cash without receiving a single machine. Nor can plaintiff seriously maintain that there was a "close connection" between the defendants' conduct and his $20,000 loss; the only conduct engaged in by Welch was the manufacture of fruit drinks and the ownership of a popular trademark which was used by Universal in advertisements; the only conduct engaged in by Hormel was the distribution of the fruit drinks and permitting its name to be used as a reference.

But even assuming that the foregoing factors weighed in Hale's favor, the critical element militating against him is that no moral blame can be attributed to the defendants' conduct; Hale's case stands or falls on his conversation with Hormel's manager (Brown); Brown told him that Universal was a "new company," and "just getting started" (facts); that Universal paid its bills for the cases of fruit drinks purchased from Hormel (a fact); and an investment in Universal was not an investment in Welch Foods or Hormel (a fact). The foregoing statements were true. On the other hand, Brown's opinion that Universal enjoyed a good reputation can hardly be characterized as reprehensible. So far as Hormel's manager was concerned, the opinion had some basis in fact inasmuch as Universal did pay for the drinks it ordered. Unlike the accountant, soil tester, banker, weigher and magazine publisher referred to in the foregoing cases, neither Hormel nor Welch were in the business of supplying information. In short, nothing Hormel or Welch did can be said to be closely related to Universal's fraud or breach of contract.

Finally, the burden of requiring Welch and Hormel to investigate every firm or person which might be interested in vending their products would be onerous: too many individuals and organizations are involved in a national marketing system to require a financial check on each one.

In view of the foregoing facts and policy considerations, the conclusion is inescapable that neither Welch nor Hormel made any significant false or fraudulent representations which resulted in Hale's loss of his investment. Consequently, neither had a duty to investigate Universal and the trial court acted with propriety in entering judgments in their favor.

The summary judgments are affirmed.

Gardner, P. J., and McDaniel, J., concurred.