[Civ. No. 49056. Second Dist., Div. Three. Apr. 7, 1977.]

AMELIA ARAUZ, Plaintiff and Appellant, v.
ELIZABETH GERHARDT et al., Defendants and Respondents.

938

**COUNSEL**

Magana & Cathcart, Charles D. Sneathern, James H. Pooley, Blair W. Steward, Jr., and Wilson, Mosher & Sonsini for Plaintiff and Appellant.

Spray, Gould & Bowers, Daniel O. Howard, Gilliland, Koelsche, Roberson & Moser, James L. Moser, Schell & Delamer and Richard P. St. Clair for Defendants and Respondents.

**OPINION**

**FORD, P. J.**—Plaintiff Amelia Arauz has appealed from a summary judgment.

Plaintiffs Gregory Grabowski, a minor, by his guardian ad litem, Amelia Arauz, and Amelia Arauz on her own behalf brought this action against Great Western Council, Inc., erroneously designated in the complaint as Crescent Bay Area Council, Pauline Burroughs, the owner of the automobile to which reference was made in the complaint, and Elizabeth Gerhardt, the driver of the automobile.

In the first cause of action, on behalf of the minor it was alleged that on or about February 10, 1973, at approximately 5:30 p.m., at or near the intersection of Talbert Street, Saran Drive and Redland Street in the County of Los Angeles, defendants "so carelessly and negligently owned, operated, maintained, controlled and entrusted the above mentioned automobile so as to cause it to collide with the person of Gregory Grabowski, causing the injuries and damages hereinafter set forth." The minor's cause of action is not involved on this appeal.

The third cause of action of the complaint was stated to be one for "negligent infliction of emotional harm," wherein, after setting forth the facts regarding the occurrence of the accident, it was alleged as follows: "[T]hat plaintiff is informed and believes that she [plaintiff Arauz] arrived on the scene within five minutes of the actual collision and upon discovering that the injured boy was her son, suffered severe fright, shock and mental illness requiring psychiatric care." Plaintiff Arauz alleged injury to her person, past and future medical expenses, and loss of earnings and earning capacity as a result of defendants' negligence.

After answers to the first amended complaint were filed, defendants filed a notice of motion for summary judgment with respect to the third cause of action of that complaint. Declarations in support of and in opposition to the motion were filed by the parties. The motion was heard and submitted. Thereafter, the trial court made its order, which was set forth in the minutes of the court as follows: "The motion for partial summary judgment is granted. Under the facts set forth in the declarations it would seem that the plaintiff Arauz did not arrive at the scene until some time after the accident which consequently was not witnessed by her. The limiting condition in Dillon V. Legg, 68 C 2d 728, that there must be a 'sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence' is not present in the instant case." Judgment against plaintiff Amelia Arauz was entered.

In determining the sufficiency of the declarations offered by the parties on the motion for summary judgment we are guided by familiar principles. As was stated in *Parker* v. *Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176, at page 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615]: ■ "The familiar rules are that the matter to be determined by the trial court on a motion for summary judgment is whether facts have been presented which give rise to a triable factual issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits or declarations [fn. omitted] in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show facts sufficient to present a triable issue of fact. ■ The affidavits of the moving party are strictly construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts. [¶] ■ The moving party cannot depend upon allegations in his own pleadings to cure deficient

affidavits, nor can his adversary rely upon his own pleadings in lieu or in support of affidavits in opposition to a motion; however, a party can rely on his adversary's pleadings to establish facts not contained in his own affidavits. [Citation.] Also, the court may consider facts stipulated to by the parties and facts which are properly the subject of judicial notice. [Citations.]" (See *Jacobs* v. *Retail Clerks Union, Local 1222,* 49 Cal.App.3d 959, 964-965 [123 Cal.Rptr. 309]; *Hale* v. *George A. Hormel & Co.,* 48 Cal.App.3d 73, 81 [121 Cal.Rptr. 144].)

In the declaration of defendant Betsy B. Gerhardt it was stated that she was returning several members of the Cub Scouts to their homes after an outing at the Culver City Ice Rink. Plaintiff Gregory was with her. After she "dropped him off at his apartment complex" her "vehicle made contact" with Gregory. She observed him at the right of her vehicle "where he was attempting to get up off the pavement." When she alighted from her vehicle, "the only visible injury" she observed was "a very small amount of blood" on Gregory's forehead. He did not appear to be "bleeding in any other area of his body." There were no bloodstains on his clothes and his clothing was not torn. He was not crying but he appeared to be "moderately upset." She and Gregory walked to the curb and sat down. Sometime thereafter plaintiff Amelia Arauz "arrived at the scene"; this was prior to the arrival of the ambulance.

The declaration of James L. Craig, one of the defense attorneys, contained excerpts from the deposition of a witness, Mrs. Mary Barker. When Mrs. Barker approached the scene of the accident she saw defendant Gerhardt and plaintiff Gregory standing "on the grass back from the curb." Mrs. Gerhardt was holding Gregory. Except for a cut on his head, she did not notice any injury to the boy and he complained of none. She saw neither blood on his clothing nor rips thereof. She stated that the ambulance arrived "[p]ossibly" ten minutes after she got to the scene of the accident; it took her between two to five minutes to run from her apartment to the scene of the accident after a boy ran down the hall saying that there had been an accident.

Portions of plaintiff Arauz' deposition were included in the declaration of Lon Harris, another defense attorney. In one portion plaintiff Arauz testified that she was given tranquilizers at the hospital after the accident. Other than being tired and having a floating feeling from the Valium given to her, she had no problems or complaints immediately after the accident. She further testified: "Q. Within approximately three months

after the accident describe for me, please, all the problems, symptoms, and complaints you had at that time? . . . THE WITNESS: Yes. And I became very cold all over. All I wanted to do was sleep. Very, very depressed I used to go to Dr. Labin, and I couldn't talk to him. I start crying. I think I went twice to him, and he just stand there and look at me. And he say he was expecting me go—I mean it was—I was coming, the reaction from the accident was coming to me. At work I was just upset, very much upset. Then, when the boy went to school, I became very panic, and I just run. I want to run away with him some place, I guess, hide. I decide to go back to Panama."

The declaration of Brian Magana, one of the attorneys for plaintiff Arauz, was offered in opposition to the motion. That declaration also included excerpts from plaintiff Arauz' deposition. Therein plaintiff Arauz testified that she was traveling down Manchester Boulevard and just after turning left onto another street she saw the scene of the accident. She further testified as follows: "When I arrived, one lady screamed, 'That is the mother of the child.' And somebody—I say, 'How did it happen?' He say about three minutes ago. Another one told me a little bit longer. 'You must missed it.' . . . Q. When you first saw Gregory, can you describe for me, please, where you were and where he was when you first saw him? A. I saw very little of Gregory because they trying to hold me back. I saw lots of blood all over some people—I guess they were holding him—all over from the head down. But, like I say, they trying me not to get close to him."

Also contained in Attorney Magana's declaration was the following excerpt from a prior deposition of plaintiff Arauz, wherein she testified: "Q. When you got close to Gregory, how close did you get? A. Very close to him but just for a second because they pulled me away. Just a few feet away from him. I couldn't touch him, nothing. Q. And did you have a chance to look at Gregory? A. Yes, I saw blood running all over, and one lady was blood all over her. Q. Where did you see blood all over? A. All over his face and his head and the jacket and the shoes and part of the shoes. And one lady has blood and the towels because they have had blood."

Excerpts from the deposition of the minor plaintiff, Gregory Grabowski, were also set forth in Attorney Magana's declaration as follows: "Q. Do you recall the car hitting you at any time? A. No. Q. Did you know who pulled you from underneath the car and up to the sidewalk? A. Huh-uh. He or she pulled under the armpits. Q. You don't remember

whether it was male or female? A. No. Q. And they pulled you up on the sidewalk? A. Yes. Q. And then the next thing you remember is hearing an ambulance coming? A. Yes, but before that someone brang a bunch of ice. Q. Someone brought some ice? Where did they put the ice? A. I think they put it around my forehead, and when I went to touch my face, my hand was bleeding, and I saw my jacket full of blood. Q. Your jacket had blood on it? A. Yes. . . . Q. Did you mother ever tell you whether or not she arrived at the scene where the accident took place before you went to the hospital? A. Yes. Q. What did she tell you? A. She said that she came and she just hopped out of the car, and when she saw it was me, and she let the car roll, and she came with me in the ambulance, and the only time I remember in the ambulance was I just felt this guy wrapping something around my head, and I saw the oxygen tube."

The declarations in support of and those in opposition to the motion are in substantial conflict as to the facts surrounding this incident. There are only two facts as to which there is no disagreement: (1) plaintiff Arauz is the mother of plaintiff Gregory; (2) plaintiff Arauz was not physically present at the scene of the accident at the time the boy was hit. Respondents claim that this second undisputed fact, standing alone, is sufficient to sustain a judgment in their favor as a matter of law.

As noted hereinabove, plaintiff Arauz' cause of action was stated to be one for "negligent infliction of emotional harm." Such a cause of action was first recognized in this state in *Dillon* v. *Legg,* 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. In that case the court set down guidelines for determining whether a defendant owed a plaintiff a duty of due care, stating as follows (68 Cal.2d at pp. 740-741): "We note, first, that we deal here with a case in which plaintiff suffered a shock which resulted in physical injury and we confine our ruling to that case. In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. [¶] The evaluation of these factors will indicate the *degree* of the defendant's foreseeability; obviously defendant

is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case. [¶] In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular plaintiff as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected. [¶] In the instant case, the presence of all the above factors indicates that plaintiff has alleged a sufficient prima facie case. Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma. As Dean Prosser has stated: 'when a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and will suffer serious shock.' (Prosser, The Law of Torts, [3d ed. 1964] *supra,* at p. 353. See also 2 Harper & James, The Law of Torts, [1956] *supra,* at p. 1039.)"

In *Dillon* the plaintiff mother actually witnessed the collision which resulted in the death of her infant daughter. In *Archibald v. Braverman,* 275 Cal.App.2d 253 [79 Cal.Rptr. 723], the plaintiff mother's 13-year-old son was severely injured when gunpowder, which he had purchased from defendants, exploded. The mother was not at the scene and did not witness the actual explosion but appeared within moments and suffered severe shock, resulting in physical damage, when she observed the grievous injuries to her son. In *Archibald* a summary judgment was awarded to the defendants in the trial court on the strength of the mother's admission in pretrial discovery proceedings that she had not observed the actual explosion.

In applying the guidelines set forth in *Dillon v. Legg, supra,* the appellate court in *Archibald* concluded that while *Dillon* required that the injured mother be "near" to the accident in terms of distance and

time, she need not actually witness the tortious act. Thus the court stated (275 Cal.App.2d at p. 256): "While the complaint does not reflect where the plaintiff was when she received word of the tragedy, she appeared at the scene within moments after its occurrence. A tortfeasor who causes injury to a child may reasonably expect that the mother will not be far distant and will, upon witnessing the event, suffer emotional trauma. (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741.) Consequently, the mother, having witnessed the injuries within moments after the explosion at a time when she was attempting to render aid, fulfilled the 'nearness' requirement in terms of distance as well as time. [¶] The issue then arises whether the 'observance' factor requires that the plaintiff witness the tortious act. A plaintiff claiming damages for emotional trauma as a result of injury to a third party must either be present at the time of the accident (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740-741) or the shock sustained by the plaintiff must be fairly contemporaneous with the accident rather than follow when the plaintiff is informed of the whole matter at a later date. (Prosser, Law of Torts (3d ed. 1964) p. 354.) Manifestly, the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself. Consequently, the shock sustained by the mother herein was 'contemporaneous' with the explosion so as to satisfy the 'observance' factor."

In *Deboe* v. *Horn,* 16 Cal.App.3d 221 [94 Cal.Rptr. 77], the plaintiff wife first saw her husband at the emergency hospital where he had been taken after the accident. The appellate court stated that, as a matter of law, under such circumstances there was no liability for the wife's alleged injuries resulting from emotional distress.

In *Powers* v. *Sissoev,* 39 Cal.App.3d 865 [114 Cal.Rptr. 868], the child, Kathleen, was struck by a truck and taken to an emergency receiving hospital where she was treated and released. Kathleen's mother, Karen, was not at home at the time of the accident and she did not see her daughter's injuries until 30 to 60 minutes after the accident. The appellate court stated as follows (39 Cal.App.3d at pp. 873-874): "Although it is true, as the concluding paragraph in the extract above-quoted from *Dillon* shows, that the rule allowing recovery for emotional shock and its after effect is not necessarily limited to the narrow facts involved in that case, and although the footnote in *Capelouto* [*Capelouto* v. *Kaiser Foundation Hospital,* 7 Cal.3d 889, 892, fn. 1] tangentially seems to indicate a right of recovery for physical harm flowing from knowledge of an unobserved tort, we do not think that this

court (especially in light of the strong dissents in *Dillon*) should extend the rule to a case such as this where the shock, as claimed, resulted from seeing the daughter 30 to 60 minutes after the accident and thereafter under circumstances not materially different from those undergone by every parent whose child has been injured in a nonobserved and antecedent accident."

In *Jansen v. Children's Hospital Medical Center,* 31 Cal.App.3d 22 [106 Cal.Rptr. 883], the plaintiff mother sought damages for physical injuries caused by emotional trauma allegedly experienced by her as a result of witnessing her daughter's progressive decline and eventual death in the hospital. It was alleged that plaintiff's daughter was admitted to the hospital suffering from an unspecified ailment and that the hospital negligently carried out its obligation to treat the girl, resulting in her death. It was alleged that the mother accompanied her child to the hospital and "stayed with her for extended periods of time during her hospitalization"; that she "witnessed [her child's] last hours and her death"; and that the child "died painfully . . . from what was subsequently diagnosed as a massive gastro-intestinal hemorrhage due to a penetrating duodenal ulcer."

In affirming the trial court judgment, based on the sustaining of a demurrer, the appellate court stated in *Jansen* (31 Cal.App.3d at p. 24): "*Dillon,* recognizing the need to 'limit the otherwise potentially infinite liability which would follow every negligent act,' sets up three guidelines for determining foreseeability of injury to another than the person actually struck. The first two of these are 'whether plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it,' and whether the shock 'resulted from . . . the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.' [¶] This language contemplates a sudden and brief event causing the child's injury. More important to the facts before us, however, the two quoted conditions emphasize the need that the event causing injury to the child must itself be one which can be the subject of sensory perception. Appellant seeks the construction that visibility of the result, as distinguished from that of the tortious act itself, is the essential element. [¶] This view, however, could well approach the 'potentially infinite liability' which *Dillon* purports to avoid. Failure of diagnosis, of course, is not an event which can itself be perceived by the layman. In fact, it occurs only when the expert, however negligently, fails of perception. We by no means minimize the often agonizing effects upon a survivor of the slow decline

and death of a loved one. But to extend the rule of *Dillon* to the entire area of injury to a parent by improper diagnosis of a child's ailment (and, perhaps as logically, to the emotional impact upon a spouse and children of an ill parent) is an extreme broadening of the rule which the Supreme Court apparently sought to limit."

In *Mobaldi* v. *Regents of University of California,* 55 Cal.App.3d 573, at page 583 [127 Cal.Rptr. 720], however, the court stated: "Foreseeability depends upon what the emotionally traumatized plaintiff observes. It is observation of the consequences of the negligent act and not observation of the act itself that is likely to cause trauma so severe as to result in physical injury." In *Mobaldi* the plaintiff mother was present at the time of the tortious act but because of the nature of the act she did not comprehend its tortious character. In that case Mrs. Ramsberg took her foster son to the U.C.L.A. Medical Center for tests. At the doctor's request, Mrs. Ramsberg held the boy in her arms. In preparation for a pyelogram, by mistake one of the doctors injected a dangerously unsafe glucose solution into the child intravenously. As Mrs. Ramsberg held the child, he became spastic and convulsant, and finally comatose, suffering irreversible brain damage as a result.

The appellate court in *Mobaldi* ruled that under the circumstances plaintiff's complaint could be amended to state a cause of action under *Dillon* v. *Legg.* In harmonizing the opinion in *Jansen* v. *Children's Hospital Medical Center, supra,* 31 Cal.App.3d 22, the court in *Mobaldi* stated (55 Cal.App.3d at pp. 584-585): "In essence, *Jansen* construes *Dillon* as imposing a public policy limitation upon shift of loss from tortious conduct causing emotional distress by requiring that the plaintiff observe an act contemporaneously causing injury. . . . [¶] The *Jansen* restriction is related to the reason for the *Dillon* limitation. It recognizes that to avoid 'potentially infinite liability' [citation] *Dillon* draws its limitation in terms of a very close connection in time and geography between the negligent act and the resulting injury."

In reviewing these appellate cases it becomes clear that where the plaintiff has been allowed recovery, or has been said to have stated a cause of action, for injuries alleged to have been caused by emotional distress suffered as a result of negligent infliction of physical injury to a third person, the plaintiff has been actually present at the scene at the time of the tortious act in every case except *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253. In the case presently before this court, it is true that plaintiff Arauz arrived at the scene of the accident shortly after

it occurred. When precisely she arrived is a disputed fact. What she saw when she arrived is also disputed.

In commenting on *Archibald* v. *Braverman,* the court in *Jansen v. Children's Hospital Medical Center, supra,* 31 Cal.App.3d 22, at page 24, noted that it could be inferred that the mother in *Archibald* heard the explosion. The court further stated: "In any event, it is clear that even a lay person, viewing the gory result, necessarily reconstructed mentally the precise brief event itself, and in *Archibald,* did so substantially contemporaneously with that event."

In *Krouse* v. *Graham,* 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], the Supreme Court's most recent statement concerning the application of the principles first set down in *Dillon* v. *Legg,* the plaintiff husband was seated in the driver's seat of his car which was parked at the curb. His wife was outside the car on the curb side attempting to shut the rear door when defendant's vehicle approached the rear of the Krouse vehicle, straddled the curb and struck plaintiff's wife as it collided with the rear of plaintiff's parked car. Although plaintiff husband observed defendant's approaching car in the rear-view mirror, he did not actually see defendant's car strike his wife, and since he was pinned in the wreckage of his car as a result of the impact, he did not immediately observe the fatal injuries sustained by his wife. The jury had been instructed that the husband could recover for injuries resulting from emotional distress if such emotional distress was a result of his "being present" at the scene of the accident. The Supreme Court held that mere presence was not the test but that the jury must consider whether the plaintiff's emotional distress "was caused by the direct emotional impact of his sensory and contemporaneous observance *of the accident."* (Italics added.) The court stated that the gastric problem suffered by the plaintiff husband constituted sufficient physical injury "if it can be said fairly that it was caused by [the husband] Benjamin's shock occasioned by his *perception of the collision."* (Italics added.)

In *Krouse* the court stated that in addition to the requirement that the plaintiff actually suffer physical injury as a result of the infliction of emotional harm, "[d]ecisional law has also imposed on the remedy temporal limitations which flow from *Dillon's* requirement that the injury result 'from the sensory and contemporaneous observance *of the accident, . . .'* " (Italics added.) (19 Cal.3d at p. 76.) The court in *Krouse* gave as examples cases wherein such "temporal limitations" were imposed, namely, *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253,

*Deboe* v. *Horn, supra,* 16 Cal.App.3d 221, and *Powers* v. *Sissoev, supra,* 39 Cal.App.3d 865. The court then stated (19 Cal.3d at p. 76): "We confirm the propriety of the expression in *Archibald, supra,* that the *Dillon* requirement of 'sensory and contemporaneous observance of the accident' does not require a *visual* perception of the impact causing the death or injury. In the matter before us, although Benjamin did not see Elizabeth struck by defendant's automobile, he fully perceived the fact that she had been so struck, for he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her. Clearly, under such circumstances Benjamin must be deemed a percipient witness to the impact causing Elizabeth's catastrophic injuries."

■ While the court in *Krouse* stated that *"visual* perception of the impact causing the death or injury" is not essential, the clear implication of the discussion in *Krouse* is that some type of sensory perception of the impact contemporaneous with the accident is necessary to meet the *Dillon* requirement. In the present case, since plaintiff was not at the scene of the accident at the time of the impact and not near enough to the scene to have any sensory perception of the impact, it cannot be said that any injuries she may have suffered were caused by the direct emotional impact of her sensory and contemporaneous observance of the accident. (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740.) As was the case in *Powers* v. *Sissoev, supra,* 39 Cal.App.3d 865, the shock claimed by plaintiff Arauz resulted from seeing her son after the accident and, therefore, "under circumstances not materially different from those undergone by every parent whose child has been injured in an unobserved and antecedent accident."

There being no triable issue as to any material fact and defendants being entitled to a judgment as a matter of law, the trial court properly granted the motion for summary judgment.

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 2, 1977.