[L.A. No. 30574. June 8, 1977.]

LINDA SUE JUSTUS et al., Plaintiffs and Appellants, v.
JOSEPH ATCHISON et al., Defendants and Respondents.

[L.A. No. 30575. June 8, 1977.]

KAREN K. POWELL et al., Plaintiffs and Appellants, v.
JOSEPH ATCHISON et al., Defendants and Respondents.

566

**COUNSEL**

Battaglia Law Corporation and Joseph C. Battaglia for Plaintiffs and Appellants.

George O. Fekete as Amicus Curiae on behalf of Plaintiffs and Appellants.

Benton, Orr, Duval & Buckingham, Edwin Duval, Archbald, Zelezny & Spray and William J. Stewart for Defendants and Respondents.

## OPINION

MOSK, J.—The principal issue in this case is whether a stillborn fetus is a "person" within the meaning of the wrongful death statute. (Code Civ. Proc., § 377.) An additional question presented is whether the pleadings are sufficient to state a cause of action for emotional shock under the rule of *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. We conclude that both issues should be decided in the negative, and hence that the judgments should be affirmed.

The appeal arises from two factually similar actions for medical malpractice and wrongful death filed in the Santa Barbara Superior Court, each predicated on the stillbirth of a fetus occurring in the course of delivery. In case No. 101312 plaintiffs Linda Sue Justus and her husband Jeffrey A. Justus name as defendants their attending physician Joseph Atchison, M.D., an assisting physician, and the Goleta Valley Community Hospital. In case No. 101198 the plaintiffs are Karen K. Powell and her husband Robert F. Powell, and the defendants are the same Dr. Atchison, a different assisting physician, and the same hospital.

We are concerned here with the second and third causes of action of these complaints. In the second cause of action of each complaint both plaintiffs, as sole heirs, seek to state a cause of action for the wrongful death of their unborn child. In the third cause of action of each complaint the plaintiff husband seeks to state a cause of action for the shock he allegedly experienced in witnessing that death.[1]

---

[1] In each case the plaintiff wife also asserts one or more causes of action personal to her. Thus in the first cause of action of the complaints each of the wives seeks damages for injuries personally suffered by her in the negligent delivery; and in case No. 101312, plaintiff Linda Sue Justus seeks additional damages for personal injuries caused by negligence in postnatal care (fourth cause of action) and for assault and battery by reason of certain delivery procedures performed on her without her informed consent (fifth cause of action).

After four unsuccessful attempts by plaintiffs in each case to plead legally sufficient causes of action for wrongful death and shock, defendants' general demurrers on those counts were sustained without leave to further amend. In each case the court thereupon entered judgments of dismissal against plaintiffs as to the second and third causes of action. Plaintiffs appealed from such judgments, and the appeals were ordered consolidated.

■ Before addressing the merits we consider whether the appeals should have been dismissed because they have been taken from judgments which do not dispose of all the causes of action set forth in the complaints. (*Tenhet* v. *Boswell* (1976) 18 Cal.3d 150, 153 [133 Cal.Rptr. 10, 554 P.2d 331].) It is settled that the rule requiring dismissal does not apply when the case involves multiple parties and a judgment is entered which leaves no issue to be determined as to one party. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 821, fn. 3 [122 Cal.Rptr. 745, 537 P.2d 865]; *Wilson* v. *Sharp* (1954) 42 Cal.2d 675, 677 [268 P.2d 1062]; *Young* v. *Superior Court* (1940) 16 Cal.2d 211, 214-215 [105 P.2d 363]; *Rocca* v. *Steinmetz* (1922) 189 Cal. 426, 428 [208 P. 964].) The judgments now before us disposed in each case of all the causes of action in which the husbands are plaintiffs. It is irrelevant that the wives joined with the husbands as plaintiffs in one of these causes of action. This circumstance does not affect the reason for the exception, i.e., that it better serves the interests of justice to afford prompt appellate review to a party whose rights or liabilities have been definitively adjudicated than to require him to await the final outcome of trial proceedings which are of no further concern to him. Here the plaintiff husbands have been excluded from any possibility of relief by the rulings complained of; the exception therefore governs, and the appeals will lie.

I

The allegations of both complaints on the wrongful death cause of action are similar. In each, it is alleged in substance that defendants were engaged to provide obstetrical and surgical care in the delivery of plaintiffs' then unborn child; that complications arose which defendants knew or should have known required their constant attention;[2] that defendants nevertheless negligently failed to examine, diagnose, and treat the fetus, and in particular "did in fact abandon" the fetus despite

[2]It was necessary to induce Mrs. Powell's labor by administration of Pitocin; Mrs. Justus ultimately required a Caesarian section, which plaintiffs allege was neither timely nor properly performed.

their knowledge of its "worsening and critical condition"; that as a proximate result thereof the fetus suffered injuries from which it died; and that defendants were further negligent in failing to use available techniques to revive the fetus.[3]

Each complaint further alleges that the fetus was normal in all respects and would have survived but for defendants' negligence; we may assume that the pregnancy had gone to full term, although neither complaint expressly so states. Finally, while in each case it is asserted on information and belief that the fetus died "immediately prior to [its] complete severance from its mother," it is nevertheless conceded by plaintiffs that each fetus was in fact stillborn.

Plaintiffs advance several reasons to support their contention that the foregoing allegations state a cause of action for wrongful death. They invoke the "weight of authority," pointing to the fact that 25 states now recognize a cause of action for the wrongful death of a fetus,[4] while at

---

[3]The precise nature of the fatal injuries is not alleged in this cause of action. Elsewhere in the complaints—in the cause of action of plaintiff husbands for emotional shock—it is stated that in each case the umbilical cord of the fetus "prolapsed." The prolapse of an umbilical cord is its premature expulsion in advance of the fetus; the event can cause fetal death by compression of the cord between the fetus and the maternal pelvis. (Stedman's Medical Dict. (4th unabridged law. ed. 1976) p. 1146; 2 Schmidt, Attorneys' Dict. of Medicine (1975) p. P-155.)

[4]Alabama: *Eich* v. *Town of Gulf Shores* (1974) 293 Ala. 95 [300 So.2d 354].
Connecticut: *Hatala* v. *Markiewicz* (1966) 26 Conn.Supp. 358 [224 A.2d 406].
Delaware: *Worgan* v. *Greggo & Ferrara, Inc.* (1956) 50 Del. 258 [128 A.2d 557].
District of Columbia: *Simmons* v. *Howard University* (D.D.C. 1971) 323 F.Supp. 529.
Georgia: *Porter* v. *Lassiter* (1955) 91 Ga.App. 712 [87 S.E.2d 100].
Illinois: *Chrisafogeorgis* v. *Brandenberg* (1973) 55 Ill.2d 368 [304 N.E.2d 88].
Indiana: *Britt* v. *Sears* (1971) 150 Ind.App. 487 [277 N.E.2d 20].
Kansas: *Hale* v. *Manion* (1962) 189 Kan. 143 [368 P.2d 1].
Kentucky: *Mitchell* v. *Couch* (Ky. 1955) 285 S.W.2d 901; accord, *Rice* v. *Rizk* (Ky. 1970) 453 S.W.2d 732.
Louisiana: *Valence* v. *Louisiana Power & Light Co.* (La.App. 1951) 50 So.2d 847.
Maryland: *State* v. *Sherman* (1964) 234 Md. 179 [198 A.2d 71].
Massachusetts: *Mone* v. *Greyhound Lines, Inc.* (Mass. 1975) 331 N.E.2d 916.
Michigan: *O'Neill* v. *Morse* (1971) 385 Mich. 130 [188 N.W.2d 785].
Minnesota: *Verkennes* v. *Corniea* (1949) 229 Minn. 365 [38 N.W.2d 838]; accord, *Pehrson* v. *Kistner* (1974) 301 Minn. 299 [222 N.W.2d 334].
Mississippi: *Rainey* v. *Horn* (1954) 221 Miss. 269 [72 So.2d 434].
Nevada: *White* v. *Yup* (1969) 85 Nev. 527 [458 P.2d 617].
New Hampshire: *Poliquin* v. *MacDonald* (1957) 101 N.H. 104 [135 A.2d 249].
Ohio: *Stidam* v. *Ashmore* (1959) 109 Ohio App. 431 [11 Ohio Ops.2d 383, 167 N.E.2d 106].
Oklahoma: *Evans* v. *Olson* (Okla. 1976) 550 P.2d 924.
Oregon: *Libbee* v. *Permanente Clinic* (1974) 268 Ore. 258 [518 P.2d 636].
Rhode Island: *Presley* v. *Newport Hospital* (R.I. 1976) [365 A.2d 748].

most 12 reject it.[5] Next plaintiffs urge that when a developing fetus has reached the stage of "viability"—i.e., when it has become capable of living outside of its mother's body—its biological self-sufficiency should be reflected by according it legal independence as well. They further reason as follows: California permits an action for prenatal injuries by a child who survives such injuries and is born alive (*Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 P.2d 678, 93 P.2d 562]); a wrongful death action would lie if such a child were to die shortly after its birth because of those injuries (see, e.g., *Wolfe* v. *Isbell* (1973) 291 Ala. 327 [280 So.2d 758] (child died 50 minutes after birth)); and it is therefore "illogical" to deny a similar wrongful death action in the case of a fetus which suffers identical prenatal injuries but dies shortly before its birth.[6] Finally, plaintiffs claim that rejection of such a cause of action "violates public policy" because it gives tortfeasors who inflict grave injuries an incentive to refrain from any efforts to save their victims' lives.

Plaintiffs also undertake to refute the principal arguments that have been made against recognizing a cause of action for the wrongful death

South Carolina: *Fowler* v. *Woodward* (1964) 244 S.C. 608 [138 S.E.2d 42]; accord, *Todd* v. *Sandidge Construction Company* (4th Cir. 1964) 341 F.2d 75.

Washington: *Moen* v. *Hanson* (1975) 85 Wn.2d 597 [537 P.2d 266].

West Virginia: *Baldwin* v. *Butcher* (1971) 155 W.Va. 431 [184 S.E.2d 428]; accord, *Panagopoulous* v. *Martin* (S.D. W.Va. 1969) 295 F.Supp. 220.

Wisconsin: *Kwaterski* v. *State Farm Mut. Automobile Ins. Co.* (1967) 34 Wis.2d 14 [148 N.W.2d 107].

[5]Arizona: *Kilmer* v. *Hicks* (1974) 22 Ariz.App. 552 [529 P.2d 706].

California: *Norman* v. *Murphy* (1954) 124 Cal.App.2d 95 [268 P.2d 178]; *Bayer* v. *Suttle* (1972) 23 Cal.App.3d 361 [100 Cal.Rptr. 212]; *Tyrrell* v. *City & County of San Francisco* (1977) 69 Cal.App.3d 876 [138 Cal.Rptr. 504].

Florida: *Stokes* v. *Liberty Mutual Insurance Company* (Fla. 1968) 213 So.2d 695; *Davis* v. *Simpson* (Fla.App. 1975) 313 So.2d 796; but see *Miller* v. *Highlands Insurance Company* (Fla.App. 1976) 336 So.2d 636.

Iowa: *McKillip* v. *Zimmerman* (Iowa 1971) 191 N.W.2d 706.

Missouri: *State* ex rel. *Hardin* v. *Sanders* (Mo. 1976) 538 S.W.2d 336.

Nebraska: *Drabbels* v. *Skelly Oil Co.* (1951) 155 Neb. 17 [50 N.W.2d 229].

New Jersey: *Graf* v. *Taggert* (1964) 43 N.J. 303 [204 A.2d 140].

New York: *Endresz* v. *Friedberg* (1969) 24 N.Y.2d 478 [301 N.Y.S.2d 65, 248 N.E.2d 901].

North Carolina: *Gay* v. *Thompson* (1966) 266 N.C. 349 [146 S.E.2d 425, 15 A.L.R.3d 983]; accord, *Cardwell* v. *Welch* (1975) 25 N.C.App. 390 [213 S.E.2d 382]; *Yow* v. *Nance* (1976) 29 N.C.App. 419 [224 S.E.2d 292].

Pennsylvania: *Carroll* v. *Skloff* (1964) 415 Pa. 47 [202 A.2d 9]; accord, *Marko* v. *Philadelphia Transportation Co.* (1966) 420 Pa. 124 [216 A.2d 502].

Tennessee: *Hogan* v. *McDaniel* (1958) 204 Tenn. 235 [319 S.W.2d 221]; accord, *Durrett* v. *Owens* (1963) 212 Tenn. 614 [371 S.W.2d 433].

Virginia: *Lawrence* v. *Craven Tire Company* (1969) 210 Va. 138 [169 S.E.2d 440].

[6]Plaintiffs cite the well-known hypothetical example of unborn twins simultaneously suffering the same prenatal injury from which one dies before and the other dies after

of a fetus. Thus plaintiffs deny that the damages for such wrongful death are in effect recoverable in the mother's cause of action for her personal injuries: the latter award cannot include compensation for the death of the fetus (*Thomas* v. *Gates* (1899) 126 Cal. 1, 7-8 [58 P. 315]) or for the deprivation of its society and comfort had it lived; nor, obviously, is the father of the fetus thereby compensated for his own loss. For the same reasons it is asserted there is no risk of double recovery in this situation: procedural devices such as joinder and appropriate jury instructions are available to insure against confusion of these distinct interests. Plaintiffs also reject the argument that damages for the death of a fetus are too speculative to calculate: not only are problems of proof an inadequate ground for denying a remedy outright, but the damages here sought are no more difficult to determine than in the case in which the fetus dies shortly after birth from prenatal injuries; in either event the principal ingredient in the award is the loss of future consortium, an item long held recoverable in this state in actions for the wrongful death of a minor child (see, e.g., *Bond* v. *United Railroads* (1911) 159 Cal. 270, 286 [113 P. 366]).

We have carefully considered these arguments, each of which finds support in one or more of the out-of-state decisions recognizing a cause of action for the wrongful death of a fetus (fn. 4, *ante*). They are not all equally convincing, and some are put in serious question by the decisions rejecting this cause of action (fn. 5, *ante*) and by the legal scholars.[7] But we need not enter this debate, less still attempt to settle it. ■ The considerations advanced by plaintiffs would be relevant if we were called upon to decide whether California should adopt the proposed cause of action as a matter of judge-made law; they are not persuasive when, as here, the cause of action for wrongful death in this state is a pure creature of statute.

---

birth: "Surely logic requires recognition of causes of action for the deaths of both, or for neither." (*Stidam* v. *Ashmore* (1959) *supra*, 167 N.E.2d 106, 108.)

[7] The United States Supreme Court has said that the development of a cause of action for the wrongful death of a fetus is "generally opposed by the commentators . . . ." (*Roe* v. *Wade* (1973) 410 U.S. 113, 162 [35 L.Ed.2d 147, 182, 93 S.Ct. 705]; see, e.g., 2 Harper & James, The Law of Torts (1956) § 18.3, p. 1031 (see also *id.*, 1968 supp., pp. 71-72); Gordon, *The Unborn Plaintiff* (1965) 63 Mich.L.Rev. 579, 591-595; Wenger, *Developments in the Law of Prenatal Wrongful Death* (1965) 69 Dick.L.Rev. 258; but see 1 Speiser, Recovery for Wrongful Death (2d ed. 1975) §§ 4.36-4.38; Del Tufo, *Recovery for Prenatal Torts: Actions for Wrongful Death* (1960) 15 Rutgers L.Rev. 61, 73-80.) The American Law Institute declines to take a position on the question (Rest. 2d Torts (Tent. Draft No. 16, Apr. 24, 1970) § 869, subd. (2)), as does Dean Prosser (Prosser, Torts (4th ed. 1971) p. 338).

The distinction is illustrated by our decision in *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669]. At issue there was whether California should adhere to the rule that a spouse has no cause of action for loss of consortium caused by negligent injury to the other spouse. The rule had no statutory foundation, but originated in two earlier decisions of this court. We considered a variety of arguments similar and in some instances identical to those urged herein (*id.,* at pp. 389-408), and held that a cause of action for loss of spousal consortium should be recognized in California. (*Id.,* at p. 408.) But we made it clear that we felt free to do so because the rule under review was a judicial creation: rejecting a claim that it could be changed only by the Legislature, we stressed the duty of the courts to modify common law doctrine to keep pace with new conditions. (*Id.,* at pp. 393-394.) The question before us, we said, was whether the rule against recovery for loss of spousal consortium should survive "as a judicially declared principle of our tort law"; to abrogate that rule, we concluded, "would not be a usurpation of legislative authority, but a reaffirmation of our high responsibility to renew the common law of California when it is necessary and proper to do so." (*Id.,* at p. 398.) In short, " 'The obstacles to the wife's action were judge-invented and they are herewith judge-destroyed.' " (*Id.,* at p. 396.)

In sharp contrast, the obstacle to plaintiffs' actions for wrongful death is not a common law doctrine but an act of the Legislature which both created and limited the remedy: "Before 1862 there was no wrongful death action in this state. [Citation.] In that year the Legislature, following the philosophy of Lord Campbell's Act, and to a substantial extent its phraseology, created such a cause of action. (Stats. 1862, p. 447.)" (Fn. omitted.) (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 190-191 [288 P.2d 12, 289 P.2d 242].)[8]

This court first had occasion to address the matter shortly after adoption of the 1862 statute. (*Kramer* v. *Market Street Railroad Company* (1864) 25 Cal. 434.) Apparently for the purpose of explaining the

---

[8]The opinion quotes (at p. 191) the key terms of section 1 of the 1862 statute: " 'Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default, is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then, . . . the person who . . . would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured . . . .' "

For purposes of comparison, the *Buckley* opinion also quotes (at pp. 190-191, fn. 1) the material portions of Lord Campbell's Act, adopted by Parliament in 1846. (9 & 10 Vict., ch. 93, pp. 531-532.)

necessity for the legislation, the court embraced the view that the common law did not recognize a cause of action for wrongful death. Citing both English and American cases, the court expressed itself vigorously on the point: "That a civil action for the death of a person, *per se,* cannot be maintained by any one at common law is too well settled to admit of discussion at the present time. This rule is so well and firmly established that an investigation of its reason and philosophy would be idle and useless." (*Id.,* at p. 435.) An action for wrongful death, the court then held, could be maintained in California only by virtue of the 1862 statute.[9]

In the years following *Kramer* the courts of this state frequently reiterated that the cause of action for wrongful death was unknown at common law and is purely a creature of statute.[10] In 1970, however, the United States Supreme Court recognized a cause of action for wrongful death under general maritime law and in so ruling cast doubt on the historical basis of the first of these beliefs, i.e., that no cause of action for wrongful death existed at common law. (*Moragne* v. *States Marine Lines* (1970) 398 U.S. 375, 381-386 [26 L.Ed.2d 339, 346-349, 90 S.Ct. 1772]; accord, 1 Speiser, Recovery for Wrongful Death (2d ed. 1975) §§ 1:1-1:7; see generally Annot., 61 A.L.R.3d 906.) We do not question the soundness of Justice Harlan's historical research in *Moragne*; but we decline to follow the Massachusetts court, which subsequently concluded therefrom that state law on the subject "has also evolved to the point where it may now be held that the right to recovery for wrongful death is of common law origin" (*Gaudette* v. *Webb* (1972) 362 Mass. 60 [284 N.E.2d 222, 229, 61 A.L.R.3d 893]). As will appear, in California the question is not a matter of "evolution" but of legislative intent.

[9]One might have thought such an action could have been brought under section 11 of the Practice Act of 1851 (Stats. 1851, ch. 5, § 11, p. 52), which declared in part that a father or mother "may maintain an action for the . . . death of a child; . . ." In the view of the *Kramer* court, however, that section did not "create a right of action where none existed before," but merely designated the persons who could bring such an action if it should "thereafter be created by statute" (25 Cal. at p. 436). The ruling emphasizes the importance of the 1862 legislation, predecessor of Code of Civil Procedure section 377.

[10]See e.g., *Webster* v. *Norwegian Mining Co.* (1902) 137 Cal. 399, 400 [70 P. 276]; *Bond* v. *United Railroads* (1911) *supra,* 159 Cal. 270, 275-276; *Pritchard* v. *Whitney Estate Co.* (1913) 164 Cal. 564, 568 [129 P. 989]; *McLaughlin* v. *United Railroads* (1915) 169 Cal. 494, 495 [147 P. 149]; *Clark* v. *Goodwin* (1915) 170 Cal. 527, 529 [150 P. 357]; *Krause* v. *Rarity* (1930) 210 Cal. 644, 653 [293 P. 62, 77 A.L.R. 1327]; *Buckley* v. *Chadwick* (1955) *supra,* 45 Cal.2d 183, 190-191; *Keena* v. *United Railroads of S. F.* (1922) 57 Cal.App. 124, 130 [207 P. 35]; *Evans* v. *Shanklin* (1936) 16 Cal.App.2d 358, 362 [60 P.2d 554]; *Norman* v. *Murphy* (1954) *supra,* 124 Cal.App.2d 95, 97; *Kunakoff* v. *Woods* (1958) 166 Cal.App.2d 59, 62 [332 P.2d 773]; *Moxon* v. *County of Kern* (1965) 233 Cal.App.2d 393, 397 [43 Cal.Rptr. 481]; *Bayer* v. *Suttle* (1972) *supra,* 23 Cal.App.3d 361, 364.

It is true, as *Moragne* pointed out, that recovery for wrongful death is now authorized by statute in every Anglo-American jurisdiction, and that a broad legislative policy decision may also serve as a source of the common law. (398 U.S. at pp. 389-392 [26 L.Ed.2d at pp. 350-352].) But as the high court further observed, "The legislature does not, of course, merely enact general policies. By the terms of a statute, it also indicates its conception of the sphere within which the policy is to have effect." (*Id.*, at p. 392 [26 L.Ed.2d at p. 352].) There are two alternatives: either the Legislature meant to deal with only the narrow issue specifically addressed in the statute, leaving to the courts the task of filling such gaps in the law as may remain; or it intended to regulate the entire question itself—to "occupy the field"—thus cutting off all future judicial initiative. (*Ibid.*) Applying this test, the *Moragne* court reviewed the history and wording of existing federal legislation permitting wrongful death actions in certain circumstances (i.e., on the high seas or in the course of employment) and inferred that Congress did not intend thereby to preclude such actions in other situations arising under general maritime law. (*Id.*, at pp. 393-403 [26 L.Ed.2d at pp. 352-358].)

A similar analysis in the case at bar leads us, however, to the opposite result. To begin with, until *Moragne* it was generally believed the common law did deny a cause of action for wrongful death. (See cases collected in fn. 10, *ante*.) Whether or not the belief was well founded, it was so widely held that we must presume the legislators acted upon it. Accordingly, their intent in adopting the 1862 statute, and its successor section 377, was manifestly to create an entirely new cause of action where none was thought to exist before. The new statutory remedy was phrased in terms of general application (see fn. 8, *ante*), in contrast to the limited reach of the federal wrongful death legislation reviewed in *Moragne*. Furthermore, since the enactment of the Code of Civil Procedure in 1872 the Legislature has amended section 377 a number of times, regulating the remedy in ever greater detail. In its current version, for example, the statute is made broadly applicable to any intentional or negligent death of "a person"; it authorizes a damage action by his heirs or personal representatives against the wrongdoer or, if he is deceased, against his personal representative; it permits various joinders of parties and consolidations of actions when appropriate; it specifies the nature and method of distribution of the damages; and it provides an elaborate list of the classes of individuals who are entitled to bring such an action.[11]

---

[11]As amended in 1975, section 377 provides:

"(a) When the death of a person is caused by the wrongful act or neglect of another, his heirs or personal representatives on their behalf may maintain an action for damages

In these circumstances we are persuaded that the Legislature intends to occupy the field of recovery for wrongful death. For this reason the remedy remains a creature of statute in California (*Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 656 [135 Cal.Rptr. 75, 557 P.2d 507]; *Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 119-120 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204]) regardless of whether a cause of action for wrongful death did or did not exist at common law. In our state that question is now of academic interest only, and we need not reconsider the many decisions addressing it. (Fn. 10, *ante.*)

Because it is a creature of statute, the cause of action for wrongful death "exists only so far and in favor of such person as the legislative power may declare." (*Pritchard* v. *Whitney Estate Co.* (1913) *supra,* 164 Cal. 564, 568.) The question, therefore, is whether the Legislature intends section 377 to provide a cause of action for the wrongful death of a stillborn fetus. We begin by identifying the precise statutory language which holds the answer to our inquiry. At the time the complaints herein were filed, section 377 authorized an action for wrongful death "When the death of a person not being a minor, or when the death of *a minor person* who leaves surviving him either a husband or wife or child or children or father or mother, is caused by the wrongful act or neglect of another" (italics added). The emphasized phrase was given a special

against the person causing the death, or in case of the death of such wrongdoer, against the personal representative of such wrongdoer, whether the wrongdoer dies before or after the death of the person injured. If any other person is responsible for any such wrongful act or neglect, the action may also be maintained against such other person, or in case of his death, his personal representatives. In every action under this section, such damages may be given as under all the circumstances of the case, may be just, but shall not include damages recoverable under Section 573 of the Probate Code. The respective rights of the heirs in any award shall be determined by the court. Any action brought by the personal representatives of the decedent pursuant to the provisions of Section 573 of the Probate Code may be joined with an action arising out of the same wrongful act or neglect brought pursuant to the provisions of this section. If an action be brought pursuant to the provisions of this section and a separate action arising out of the same wrongful act or neglect be brought pursuant to the provisions of Section 573 of the Probate Code, such actions shall be consolidated for trial on the motion of any interested party.

"(b) For the purposes of subdivision (a), 'heirs' mean only the following:

"(1) Those persons who would be entitled to succeed to the property of the decedent according to the provisions of Division 2 (commencing with Section 200) of the Probate Code, and

"(2) Whether or not qualified under paragraph (1), if they were dependent ·on the decedent, the putative spouse, children of the putative spouse, stepchildren, and parents. As used in this paragraph, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.

"Nothing in this subdivision shall be construed to change or modify the definition of 'heirs' under any other provision of law."

meaning in *Norman* v. *Murphy* (1954) *supra,* 124 Cal.App.2d 95, the first California case to face the question now before us.

In *Norman* the Court of Appeal turned for guidance to two provisions of the Civil Code, sections 25 and 26. The former provided at the time that "Minors are all persons under 21 years of age," with a number of exceptions relating to emancipation by marriage; and section 26 declared, as it still does, that "The periods specified in the preceding section must be calculated from the first minute of *the day on which persons are born* to the same minute of the corresponding day completing the period of minority." (Italics added.) The *Norman* court read these provisions together with section 377, and reasoned that the italicized language of section 26 was intended to prescribe the moment at which the state of minority began, thereby excluding unborn fetuses from the class of "minor persons" referred to in section 377. (*Id.,* at pp. 97, 100; see also *Bayer* v. *Suttle* (1972) *supra,* 23 Cal.App.3d 361, 364.)

The reasoning is erroneous. The purpose of section 26 is to facilitate computation not of the beginning but of the end of the period of minority (Comment (1955) 28 So.Cal.L.Rev. 400, 403, fn. 22), i.e., to fix the date of the legally important event by which all persons lose the privileges and disabilities of minors and assume the rights and duties of adults. (See, e.g., *Ganahl* v. *Soher* (1884) 2 Cal.Unrep. 415 [5 P. 80]; *Ex parte Wood* (1907) 5 Cal.App. 471 [90 P. 961].) In the context of section 377 as it read at the time here pertinent, the phrase "minor person" thus served to mark the end of the period during which an action could be brought for wrongful death only if the victim was survived by a spouse, child, or parent; the phrase was simply irrelevant to the issue of whether a cause of action lies for the wrongful death of a fetus. (See also *Moen* v. *Hanson* (1975) *supra,* 537 P.2d 266, 267.)

Moreover, an examination of legislative history shows that the phrase is of wholly transitory significance. As noted above (fn. 8, *ante*), the 1862 predecessor to section 377 created a cause of action for the wrongful death of "a person." That broad designation was retained in section 377 when it was originally enacted as part of the 1872 Code of Civil Procedure. In 1873 the Legislature narrowed the section by limiting its application to the death of "a person not being a minor," i.e., of an adult only. (Code Amends. 1873-1874, ch. 383, § 40, p. 294.) In 1935 the section was broadened to include "a minor person," but only if he was survived by a spouse, child, or parent. (Stats. 1935, ch. 108, § 1, p. 460.) And in 1975 the Legislature abandoned the latter limitation, deleted the

reference to "a minor person" as surplusage, and once again made the statute generally applicable to the death of "a person." (Stats. 1975, ch. 334, § 1, p. 783, quoted at fn. 11, *ante.*)

We therefore focus our attention not on the word "minor" but on the word "person," and determine whether the Legislature intends an unborn fetus to be included within the latter term as it is used in section 377. Because the cause of action for wrongful death is based on statute in all states—with the apparent exception of Massachusetts—little would be gained by analyzing the numerous decisions of our sister jurisdictions on the topic. (Fns. 4 & 5, *ante.*) "For when the last word shall have been said in such a consideration, the paramount fact will still remain that rights under our section 377 of the Code of Civil Procedure are to be defined not by what other courts have said touching their own statutes, but from the meaning and intent of our own law derived from a reading of it." (*Earley* v. *Pacific Electric Ry. Co.* (1917) 176 Cal. 79, 81 [167 P. 513].)

In *People* v. *Belous* (1969) 71 Cal.2d 954, 968 [80 Cal.Rptr. 354, 458 P.2d 194], we observed "there are major and decisive areas where the embryo and fetus are not treated as equivalent to the born child." Indeed, such equivalence is the exception rather than the rule. As the United States Supreme Court explained in *Roe* v. *Wade* (1973) *supra,* 410 U.S. 113, 161, 162 [35 L.Ed.2d 147, 182], "In areas other than criminal abortion, the law has been reluctant to endorse any theory that life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth. For example, the traditional rule of tort law denied recovery for prenatal injuries even though the child was born alive. That rule has been changed in almost every jurisdiction. . . . In a recent development, generally opposed by the commentators, some States permit the parents of a stillborn child to maintain an action for wrongful death because of prenatal injuries. Such an action, however, would appear to be one to vindicate the parents' interest and is thus consistent with the view that the fetus, at most, represents only the potentiality of life. Similarly, unborn children have been recognized as acquiring rights or interests by way of inheritance or other devolution of property, and have been represented by guardians *ad litem.* Perfection of the interests involved, again, has generally been contingent upon live birth. In short, the unborn have never been recognized in the law as persons in the whole sense." (Fns. omitted.) In particular, the court in *Roe* held that "the word 'person,' as used in the Fourteenth Amendment,

does not include the unborn." (Fn. omitted; *id.,* at p. 158 [35 L.Ed.2d at p. 180].)

The law of California on these questions is statutory. Recovery is permitted for prenatal injuries by a child who is born alive, solely because the action falls within the terms of Civil Code section 29. That section provides generally that "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; . . ." Among the "interests" of the child under this statute is the right to compensation for personal injuries inflicted by the intentional or negligent conduct of another. (*Scott* v. *McPheeters* (1939) *supra,* 33 Cal.App.2d 629, 630-632.)

The property rights of an unborn child are also prescribed in Civil Code section 29, together with a number of special statutes on the subject.[12] Thus it is declared that in law "A posthumous child is considered as living at the death of the parent." (Prob. Code, § 250.) Such a child is entitled to be included among pretermitted heirs (Prob. Code, §§ 71, 90); he can inherit a future interest (Prob. Code, § 123; Civ. Code, § 698); and he can defeat a future interest in another (Civ. Code, § 739). None of these rights vests, however, unless and until the child is born alive: that requirement is implicit in the phrase "posthumous child," and is explicitly stated both in Civil Code section 29 and in the cited provision of Probate Code section 123 ("A child conceived before but born after" the testator's death may take a future interest).

Lastly, in the limited instances in which the Legislature has extended the protection of the criminal law to the unborn child, it has specially identified the object of its concern. Thus Penal Code section 270 makes it a misdemeanor for a father to wilfully fail to provide support for a "minor child." Such legislation was construed to be inapplicable to a failure to support an unborn child. (See *People* v. *Yates* (1931) 114 Cal.App.Supp. 782, 785 [298 P. 961].) When the Legislature determined to extend the statute to that situation it did so expressly, by borrowing the language of Civil Code section 29 and incorporating it in the following amendment to Penal Code section 270: "A child conceived but not yet born is to be deemed an existing person insofar as this section is concerned." (Stats. 1925, ch. 325, § 1, p. 544.)

---

[12]As we noted in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 638-639 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], in this respect section 29 is a codification of common law rules which were already settled in Blackstone's time.

Again, prior to 1970 murder was defined as the unlawful and malicious killing of "a human being." (Pen. Code, § 187.) In that year we held—in accord with the settled common law rule at the time of the enactment of the Penal Code—that the prior live birth of the victim was mandatory to a conviction of murder and hence that a fetus was not a "human being" within the meaning of section 187. (*Keeler* v. *Superior Court* (1970) *supra,* 2 Cal.3d 619, 628-631.) The Legislature thereupon chose to extend the statute to the case of the unborn child, but did so by creating a new category of murder victims: rather than redefine the term "human being" to *include* a fetus, the Legislature declared that murder is now the unlawful and malicious killing of "a human being, *or* a fetus" (italics added; Stats. 1970, ch. 1311, § 1, p. 2440).[13]

We conclude from the foregoing that when the Legislature determines to confer legal personality on unborn fetuses for certain limited purposes, it expresses that intent in specific and appropriate terms; the corollary, of course, is that when the Legislature speaks generally of a "person," as in section 377, it impliedly but plainly excludes such fetuses. We are not so naive as to believe that the Legislature entertained any intent at all with respect to fetuses when it first addressed the question of recovery for wrongful death in 1862 and 1872. (Cf. *Britt* v. *Sears* (1971) *supra,* 277 N.E.2d 20, 24-25; *Kwaterski* v. *State Farm Mut. Automobile Ins. Co.* (1967) *supra,* 148 N.W.2d 107, 111.) But we may fairly infer that if at any time during the ensuing century the Legislature had meant to include fetuses among the class of victims described in section 377, it could easily have so provided by amending the statute in either of the ways in which, as we have seen, it amended Penal Code sections 187 and 270 for the very same purpose. We decline to promulgate such an amendment ourselves.

In so holding we are not unmindful of our statutory duty to construe each provision of the Code of Civil Procedure liberally and with a view to effect its objects and promote justice. (Code Civ. Proc., § 4.) Section 377 must indeed be so read. (*Bond* v. *United Railroads* (1911) *supra,* 159 Cal. 270, 276.) But we do not join those courts which have equated fetus with person simply because the wrongful death statute is "remedial" and

---

[13]The disjunctive form must be deemed deliberate, because earlier versions of the bill had proposed to redefine human being to "include" a fetus. (Assem. Bill No. 816, 1970 reg. sess.) The version actually adopted confirms our reading of the original statute in *Keeler.*

We note also that in the Therapeutic Abortion Act the Legislature uses the term "fetus" to refer to the product of human conception regardless of the duration of the pregnancy. (Health & Saf. Code, § 25956, subd. (a).)

must be "liberally" construed. (See, e.g., *Kwaterski* v. *State Farm Mut. Automobile Ins. Co.* (1967) *supra,* 148 N.W.2d 107, 111.) Section 4 of the Code of Civil Procedure and its companion provisions (Civ. Code, § 4; Pen. Code, § 4) are intended to abrogate the earlier rule that statutes in derogation of the common law must be strictly construed (see, e.g., *Kramer* v. *Market Street Railroad Company* (1864) *supra,* 25 Cal. 434, 436), and to furnish assistance in interpreting *ambiguous* acts of the Legislature. When the intent of that body is clear, as we hold it is in the case at bar, there is no room for construction, liberal or otherwise. (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) In such circumstances section 4 cannot be invoked to enlarge or restrict the plain meaning of this legislation. (See, e.g., *Baxter* v. *Shanley-Furness Co.* (1924) 193 Cal. 558, 560 [226 P. 391]; *Ruiz* v. *Industrial Acc. Com.* (1955) 45 Cal.2d 409, 413 [289 P.2d 229] (Lab. Code, § 3203).) Because of the above-discussed legislative history in California, such a reading "would rewrite the statute in the guise of construing it" (*Solberg* v. *Superior Court, supra,* at p. 198).

In conclusion, we agree with one of the latest reported expressions of judicial opinion on this issue, in which a unanimous Missouri Supreme Court held that "a wrongful death action may not be maintained for the death of an unborn child. It is our view that a fetus is not a 'person' within the meaning of our wrongful death statute until there has been a live birth. We think the legislature in enacting the original act and subsequent revisions did not intent to create an action for the death of a fetus never born alive. In view of the common law rule that an unborn fetus was not a 'person' we think if there had been an intention to create such an action it would have been specifically so stated." (*State* ex rel. *Hardin* v. *Sanders* (1976) *supra,* 538 S.W.2d 336, 338-339; accord, *Cardwell* v. *Welch* (1975) *supra,* 213 S.E.2d 382, 383-384; *Davis* v. *Simpson* (1975) *supra,* 313 So.2d 796, 797-798; *Kilmer* v. *Hicks* (1974) *supra,* 529 P.2d 706, 708; *Endresz* v. *Friedberg* (1969) *supra,* 248 N.E.2d 901, 903.) Two of the California decisions in point were based in part on a similar analysis (*Norman* v. *Murphy* (1954) *supra,* 124 Cal.App.2d 95, 98, 99; *Bayer* v. *Suttle* (1972) *supra,* 23 Cal.App.3d 361, 364); we therefore approve their holding, and, to this extent, their reasoning.

There is no merit in plaintiffs' alternate contention that if section 377 does not provide a cause of action for the wrongful death of a fetus, it denies them equal protection of the laws. That constitutional doctrine is not intended "to make it necessary that the legislature, when conferring new rights of action upon particular classes of citizens for

injuries not previously actionable, should by the same act declare that all persons who may suffer damages from injuries of that character shall also have such right of action. Many considerations of public policy affect the question of the propriety and extent of such laws, the weight and effect of which, and the method of meeting or avoiding them, are matters resting exclusively in the legislative discretion. . . . The decision of the legislature as to how far it will extend the new right is conclusive, unless it appears beyond rational doubt that an arbitrary discrimination between persons or classes similarly situated has been made without any reasonable cause therefor." (*Pritchard* v. *Whitney Estate Co.* (1913) *supra,* 164 Cal. 564, 568; accord, *Steed* v. *Imperial Airlines* (1974) *supra,* 12 Cal.3d 115, 123-124; *Tyrrell* v. *City & County of San Francisco* (1977) *supra,* 69 Cal.App.3d 876, 881.)

■ We cannot say it is irrational for the Legislature to refrain from providing a cause of action for wrongful death to the parents of a stillborn fetus. The purpose of section 377 is to enable the heirs and certain specified dependents of a person wrongfully killed to recover compensation for the economic loss and deprivation of consortium they suffer as a result of the death. (See, e.g., *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 67-70 [137 Cal.Rptr. 863, 562 P.2d 1022].) A fetus, of course, has no "dependents," and its only possible "heirs" are its parents.[14] In addition, a fetus is evidently not a wage-earner, and its death therefore causes no appreciable economic loss to its survivors.[15] In practical effect, there remains for consideration only the parents' loss of consortium.

Without in any way denying the reality of that loss, we are compelled to observe that the class of parents who suffer the greater deprivation of this nature are those whose child has been born alive. The parents of a stillborn fetus have never known more than a mysterious presence dimly sensed by random movements in the womb; but the mother and father of a child born alive have seen, touched, and heard their baby, have witnessed his developing personality, and have started the lifelong process of communicating and interacting with him. These are the rich experiences upon which a meaningful parent-child relationship is built, and they do not begin until the moment of birth.

---

[14]For present purposes we shall assume that the parents of a stillborn fetus can be its heirs. We do not decide, however, whether as a matter of property law such a fetus is a "decedent" capable of transmitting an estate within the meaning of Probate Code section 225.

[15]Out-of-pocket expenses such as medical and burial costs are recoverable as incidents of its mother's cause of action for personal injuries.

We conclude that the distinction drawn by the statute between born and unborn children is not arbitrary, but bears a rational relationship to the legislative goal of placing reasonable limits on wrongful death actions in this state. Section 377 does not deny these plaintiffs equal protection of the laws.

## II

In the third cause of action of each complaint plaintiff husband seeks to state a claim for shock under the rule of *Dillon* v. *Legg* (1968) *supra*, 68 Cal.2d 728. We there held that a mother who saw her young child struck and killed by the car of an allegedly negligent driver could state a cause of action for physical injuries she suffered from the fright and shock of the event.

In order, however, "to limit the otherwise potentially infinite liability which would follow every negligent act," we restricted the *Dillon* cause of action to cases in which the court determines that the harm was reasonably foreseeable, "excluding the remote and unexpected." (*Id.,* at pp. 739, 741.) We then listed three factors to be taken into account in making that determination: whether the plaintiff and the victim were closely related, whether the plaintiff was present at the scene of the accident, and "Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence." (*Id.,* at pp. 740-741.) The issue is whether the complaints in the case at bar satisfy the latter condition.

In resolving that issue we first analyze how the listed factors have been applied in decisions following *Dillon.* Indeed, we there recognized (*id.,* at p. 741) that "In future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us." Including a recent opinion of this court, there have been three published decisions in California upholding a cause of action on the *Dillon* theory, and five rejecting it.

We begin with the first group. In *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], "within moments" after a child was seriously injured in an explosion his mother appeared on the scene and saw his bleeding and maimed body. The court held that the shock she suffered was essentially contemporaneous with the accident itself. (*Id.,* at p. 256.) In *Mobaldi* v. *Board of Regents* (1976) 55 Cal.App.3d 573 [127

Cal.Rptr. 720], a mother was holding her child in her arms when he became convulsive and then comatose from an improper intravenous solution being administered to him. The court held that the mother was a percipient witness to the accident even though she was unaware at the time of the negligence which caused it. (*Id.,* at p. 583.)

In *Krouse* v. *Graham* (1977) *supra,* 19 Cal.3d 59, the plaintiff husband was sitting in the driver's seat of his parked car while his wife unloaded groceries from the back seat; the defendant's vehicle suddenly approached from the rear at a high speed, straddled the curb, and struck and killed the wife before colliding with the parked car. On this issue the decision held that although the husband did not actually see his wife being struck by the defendant's car, he nevertheless perceived the event by other than visual means: "he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her." (*Id.,* at p. 76.)

With the foregoing we next compare the facts of the five cases rejecting a *Dillon* cause of action. In *Deboe* v. *Horn* (1971) 16 Cal.App.3d 221 [94 Cal.Rptr. 77], a husband was injured in an automobile accident and taken to a hospital; his wife, who had not been present at the accident, was summoned to the hospital where she learned her husband was paralyzed and first observed his condition. The court held that on these facts no cause of action could be stated under *Dillon.* In *Jansen* v. *Children's Hospital Medical Center* (1973) 31 Cal.App.3d 22 [106 Cal.Rptr. 883], a mother watched the slow but progressive deterioration and ultimate death of her hospitalized child, allegedly caused by negligent misdiagnosis. The court held that *Dillon* was inapplicable because there was no "sudden and brief event" which caused the child's injury and could be "the subject of sensory perception" by its mother. (*Id.,* at p. 24.)

In *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865 [114 Cal.Rptr. 868], a child was injured in an automobile accident and taken to a hospital; her mother, who had not witnessed the accident, did not see the child until 30 to 60 minutes after the event, and thereafter observed her worsening condition. The court held the mother's shock was not contemporaneous with the accident and arose from "circumstances not materially different from those undergone by every parent whose child has been injured in a nonobserved and antecedent accident." (*Id.,* at p. 874.) In *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538 [119 Cal.Rptr. 639], a child was

injured during surgery; his mother was in the hospital waiting room and therefore did not witness the event, and the full extent of the damage was not apparent until two days after the operation. In an alternative holding the court declared the case to be "similar to *Powers,* in that the damages are claimed to flow from knowledge of an unobserved tort." (*Id.,* at p. 543.) And in *Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937 [137 Cal.Rptr. 619], the same rule was applied when a child was injured by an automobile but his mother did not arrive, at the place of the accident until some minutes later and hence had no "sensory perception of the impact" (*id.,* at p. 949).

We now summarize the relevant allegations of the complaints in the case at bar. Each plaintiff husband asserts he was present in the delivery room and in close proximity to his wife, and observed the defendants ministering to the latter. Plaintiff Jeffrey A. Justus then alleges he saw the manipulation of the fetus with forceps and by hand, and the emergency procedures performed on his wife in connection with the attempted Caesarian section. In his complaint, plaintiff Robert F. Powell alleges he was aware of the diminution of the fetal heart tones and observed the nurse's anxiety at her inability to monitor them, and was further aware of the resulting emergency and the failure of the doctor to respond promptly when called. Each of these plaintiffs then asserts he saw the prolapsing of the umbilical cord of the fetus (see fn. 3, *ante*) and the pain and trauma of his wife. Finally, each alleges he was present when the attending physician announced that the fetus had died.

These allegations admittedly state a closer case than the five above cited which denied recovery under *Dillon*: the present matter may be distinguished from *Jansen* in that each accident herein was a relatively sudden occurrence, and from *Deboe, Powers, Hair,* and *Arauz* in that each plaintiff was at the scene when the accident took place. But *Dillon* requires more than mere physical presence: as noted above, the shock must also result from a "direct emotional impact" on the plaintiff caused by "sensory and contemporaneous observance of the accident" (68 Cal.2d at p. 740). Here, although each plaintiff was in attendance at the death of the fetus, that event was by its very nature hidden from his contemporaneous perception: he could not see the injury to the victim as in *Mobaldi,* nor could he otherwise sense it as in *Archibald* or *Krouse.* To put it another way, he had been admitted to the theater but the drama was being played on a different stage.

Viewed realistically, therefore, each complaint paints the following picture: the plaintiff husband witnessed certain disturbing developments in the delivery room, including expressions of concern by the medical staff and use of emergency procedures. Whether the described events constitute negligence is questionable, but they no doubt induced a growing sense of anxiety on the plaintiff's part. Yet his anxiety did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive spectator he had no way of knowing that the fetus had died. In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact. As we have seen, however, a shock caused by "learning of the accident from others after its occurrence" (68 Cal.2d at p. 741) will not support a cause of action under *Dillon*. (See, e.g., *Arauz* v. *Gerhardt* (1977) *supra*, 68 Cal.App.3d 937, 949.)

Moreover, in the context of this case reliance on *Dillon* seems particularly inappropriate for an additional reason. By its nature the *Dillon* cause of action presupposes that the plaintiff was an involuntary witness to the accident. Yet here, although the complaints are silent on the point, we must assume that each husband was in the delivery room by his own choice. Surely a layman who voluntarily observes a surgical operation must be prepared for the possibility of unpleasant or even harrowing experiences. This is no less true of the procedure of childbirth, which, although unlikely to be traumatic, is always subject to complications. We do not go so far as to invoke the doctrine of assumption of risk; but the ever-present possibility of emotional distress dissuades us from extending the *Dillon* rule into the operating amphitheater in these circumstances.

We conclude the trial court correctly ruled that the complaints fail to state a cause of action for shock under the rule of *Dillon* v. *Legg*.

The judgments of dismissal as to the second and third causes of action of each complaint are affirmed.

Clark, J., Richardson, J., Kaus, J.,* Wright, J.,† and Sullivan, J.,‡ concurred.

*Assigned by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

‡Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

**TOBRINER, Acting C. J.**—I concur in the result reached by the majority opinion and in the reasoning of part II of that opinion. But although I agree with the majority that we should not recognize a new cause of action for the wrongful death of a fetus, a wholly intangible injury to plaintiffs for which any monetary recovery can provide no real compensation (see *Borer* v. *American Airlines* (1977) *ante,* at pp. 446-448 [138 Cal.Rptr. 302, 563 P.2d 858]), I cannot join the reasoning by which the majority reaches that conclusion.

Even if the common law as of 1862 did not recognize a general cause of action for wrongful death, our decision must rest on the common law of 1977. In *Moragne* v. *States Marine Lines* (1970) 398 U.S. 375 [26 L.Ed.2d 339, 90 S.Ct. 1772], the United States Supreme Court pointed out that recovery for wrongful death is now authorized by statute in every Anglo-American jurisdiction, and that such a broad legislative policy may serve as a source of common law. (398 U.S. at pp. 389-392 [26 L.Ed.2d at pp. 350-352].)

In enacting the wrongful death statute, our Legislature probably initially conceived that it was creating a right of recovery unknown to the common law. But from this premise alone, I am unable to divine an affirmative legislative intent to *preclude* further judicial development. I find nothing in the statute or its history which anticipates and forbids the evolution of recovery for wrongful death into a universally recognized right of common law status. Judicial expansion and refinement of legal concepts characterizes the common law—any legislative intent to foreclose such traditional judicial activity should require positive expression.

We said that it was the intention of the Legislature in enacting those provisions of the Civil Code declarative of the common law to announce and formulate existing common law principles with a distinct view toward continuing judicial evolution. (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 814 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].) Here we have the converse situation: what was originally thought a statutory right may now serve as a source of common law. Just as "a statute is not an alien intruder in the house of the common law" (Stone, *The Common Law in the United States* (1936) 50 Harv.L.Rev. 4, 15), so too the evolving common law should be a welcome guest to domains previously thought statutory.

In sum, since this court decided to reject the asserted cause of action for the wrongful death of a fetus—as I believe it should—it must rest that

decision on reasons of policy similar to those discussed in *Borer* v. *American Airlines, supra.* (19 Cal.3d at pp. 446-448.) It cannot avoid those difficult policy choices by limiting its vision to the terms of Code of Civil Procedure section 377 and ignoring the evolving common law of today.