Filed 8/12/14  In re Daisy C. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Daisy C., a Person Coming Under the Juvenile Court Law. | B252674 (Los Angeles County Super. Ct. No. DK00778) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. NATALIE P. AND D.C., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Julie Blackshaw, Judge.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Natalie P.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant, D.C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Jeanette Cauble, Deputy County Counsel for Plaintiff and Respondent.

Appellants Natalie P. ("mother") and D.C. ("father") are the parents of Daisy C., who was born in August of 2013. On October 25, 2013 the juvenile court sustained a Welfare and Institutions Code[1] section 300, subdivision (b) petition finding that "mother's illicit substance abuse and father's failure to protect Daisy endangers Daisy's physical health and safety and places Daisy at risk of physical harm, and damage." Mother and father both appeal from the juvenile court's jurisdictional findings, contending that the court's decision was not supported by sufficient evidence. The juvenile court also denied father, the non-custodial parent, the right to the custody of Daisy under section 361, subdivision (c). Father appeals that order as well.

FACTUAL AND PROCEDURAL BACKGROUND

On August 31, 2013, the Department of Children and Family Services (the "Department") received a referral on Daisy, stating that mother had tested positive for marijuana during her pregnancy. Mother admitted to a history of drug use, and that she had consumed marijuana on a daily basis since she was 11 and had also ingested methamphetamines for four years on a daily basis (or as often as she could get the drugs) since she was 14 years old. She quit when she found out she was pregnant. She said she had attended drug treatment programs, but had relapsed. Father admitted to using marijuana, but claimed it was to help with a medical problem – anxiety attacks, loss of appetite, trouble sleeping and anemia.

A hospital social worker said mother had recently been a resident in a residential drug treatment program and had also attended parenting classes at St. Anne's Maternity Group Home. The worker also said that mother was breastfeeding Daisy and was bonding well with her. Daisy was in good health and both parents were caring for her. The social worker's sole concern was the parents' drug use.

---

[1]     All references to code sections in this opinion are to the Welfare & Institutions Code unless otherwise specifically indicated.

2

Mother admitted she was still using drugs, including methamphetamines, while she was attending drug classes. She admitted to being on probation as a juvenile and admitted to mental health problems. She knew she was in violation of her probation because of her continued drug usage. She knew ingesting drugs was not good for her fetus. She had received prenatal care while pregnant and she said that she willing to work with the Department and would do everything in her power to stop using drugs because the birth of her daughter gave her "something to live for."

Father stated that he smoked medical marijuana several times a day, but asserted that he was willing to quit for his child's sake. He had a medical marijuana card which he obtained on June 24, 2013, due to his anxiety, loss of appetite, anemia and trouble sleeping. He didn't believe that he was addicted to it. He admitted he knew about mother's drug use. He denied ever seeing mother using methamphetamines while she was pregnant. He was open to any services that the Department could provide. He denied any mental health concerns. He admitted to having a criminal history as a juvenile, which included charges of vandalism and terrorist threats, both of which occurred when he was a minor. He also admitted to being a member of a street gang for four years, but denied current involvement. He denied using marijuana in the presence of mother while she was pregnant. He said that he was not aware of her ingesting marijuana while she was pregnant until the day child was born. Even though they were living together in August of 2013, when mother tested positive for marijuana, he never smelled marijuana on her. He knew mother had been in a residential drug treatment program and knew her drug problem was serious.

Father testified that he lived with his mother and said he had baby supplies and furniture for Daisy in the home. He further testified that if Daisy were returned to him he would care for her while Daisy's paternal grandmother worked during the day, and either paternal or maternal grandmother would watch the child while he worked. Father said he had been working for two to three weeks.

Maternal grandmother said mother and father were good parents and believed that they would "work" on their drug problems. She was shocked to learn that mother had

3

tested positive for marijuana during her pregnancy, but was aware that mother was on probation due to her drug use. Mother and father were visiting Daisy on a daily basis for a few hours.

The social worker conducted a safety assessment and found that, due to the use of drugs, the risk to Daisy was high for future abuse.

On September 5, 2013, the Department filed a petition under section 300 on behalf of Daisy. Under subdivision (b) of that section, the Department alleged that mother used marijuana and methamphetamines and tested positive three times for marijuana during her last month of pregnancy. It also alleged that father was aware of her use of marijuana, but did not protect the child and that he himself was a current user of marijuana, the use of which placed Daisy at risk of harm.

A detention hearing took place on September 5, 2013. Father signed paperwork indicating that he was the father of child and both parents denied any Indian ancestry. The court (a) appointed counsel, (b) detained Daisy with release to her maternal grandmother (with mother being allowed to breastfeed the child on the condition that she test negative for drugs), and (c) calendared future hearing dates. Parents were allowed monitored visitation with the child. On September 17, 2013, the court held a pre-release investigation hearing concerning the possibility of releasing the child to father. Release was denied due to lack of information then available to the court as a result of the Department's inability to get into contact with father.

On October 23, 2013, the Department filed an amended petition. It added allegations that mother had a history of mental and emotional problems (count b-3) as did father (count b-4) who also suffered from daily anxiety attacks. The Department alleged that as a result of these mental and emotional problems, they were incapable of providing Daisy with regular care. Both parents were present at the jurisdiction/disposition hearing which took place on that date. The documents prepared and submitted by the Department were admitted into evidence without objection.

Father testified at the request of minor's counsel. The court received oral argument from all counsel. The court then dismissed counts b-2, b-3 and b-4. It

4

sustained count b-1, which alleged mother's drug use and father's failure to protect Daisy.

The court then declared Daisy a dependent of the court, found that there was clear and convincing evidence of substantial danger to her if she were returned to her parents' custody, and ordered Daisy to be removed from the custody of her parents pursuant to section 361, subdivision (c). Mother was permitted to move into maternal grandmother's home, but she was not to be left alone with Daisy and her visits outside of the home were to be monitored. Father was granted unmonitored visits with Daisy during the day in the home of the paternal grandmother, pending an assessment of her residence, and provided that grandmother was home at the time of the visits. Both parents were ordered not to ingest marijuana or be under the influence of marijuana while they were around the minor. The parents were also ordered to participate in family reunification case plans. The matter was then set for a six month status review hearing.

The parents timely filed notices of appeal.

DISCUSSION

1. *The jurisdictional finding*

A finding of jurisdiction is based on proof by a preponderance of the evidence. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 198.) Juvenile court decisions finding jurisdiction are reviewed for sufficiency of the evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) The record of the proceeding is reviewed to determine if there is any substantial evidence, whether or not contradicted, which supports the juvenile court's decision. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649.) All evidentiary conflicts are resolved in favor of upholding the ruling of the trial court, and all legitimate inferences indulged in to uphold the judgment. (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) The appellate court does not reweigh the evidence, determine issues of credibility, or resolve conflicts in the evidence; this is the province of the trial court. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766.) "The ultimate test is whether it was reasonable for a trier of fact to make the ruling in question in light of the whole

5

record.  [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 828; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Section 300, subdivision (b) provides in pertinent part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." Proof of current risk at the time of the jurisdiction hearing is not required to support jurisdiction pursuant to section 300, subdivision (b), but may be satisfied by showing that there is a substantial risk that the child will suffer serious physical harm.  (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

Daisy was removed from her parents' custody on September 5, 2013, a week after her birth, due in part to mother's drug use, some of which occurred in the last month of her pregnancy.  She testified positive for marijuana on August 9, 28 and 29, 2013. Mother, who was 18 at the time of Daisy's birth, already had a substantial history of drug abuse.  She admitted using marijuana since she was age 11 and methamphetamine since the age of 14.  Between the ages of 14 and 17, she used both drugs, sometimes on a daily basis, or whenever she could get them.  She last used methamphetamine when she was 8 weeks pregnant.  She said she ceased using illicit drugs when she learned she was pregnant.  She stated that she starting using marijuana again in August 2013, because she was anxious and depressed about having a baby.  When she got anxious and depressed she went back to her old crutch, using drugs.  The question raised by her renewed use of marijuana when she eight months pregnant and while she was aware that taking drugs was not good for her baby is what will she do when she suffers anxiety and/or depression on those difficult days when raising a child is not all fun and games.  It has been recognized that prenatal drug use, knowing that it may be harmful to the unborn child, is neglectful and indicative of future neglect.  (See *In re David M., supra,* 134 Cal.App.4th at pp. 829-830; *In re Troy D.* (1989) 215 Cal.App.3d 889, 899; *In re Solomon L.* (1987)

6

190 Cal.App.3d 1106, 1112-1113; *In re Amos L.* (1981) 124 Cal.App.3d 1031, 1037.) It is particularly dangerous when the child is an infant, since based on its tender age it requires a great deal of supervision. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 766-767.) These facts alone are sufficient to affirm the trial court's ruling sustaining the first amended petition on the basis that mother's use of drugs endangers the child's physical health and safety and places the child at risk of physical harm and damage.

Mother contends to the contrary, that even though she "freaked out" about having a baby and used marijuana while pregnant, she "rallied" after Daisy's birth and has taken care of Daisy. But mother did not have the full-time responsibility of caring for a newborn and instead the main level of responsibility rested with the child's maternal grandmother. Mother just assisted in caring for Daisy a few hours a day. This was no indication of how mother would react when a mini-crisis arises while she alone is caring for Daisy. Will she go back to her crutch of using drugs? The juvenile court could certainly consider past conduct in determining whether jurisdiction is necessary to protect a child's physical health and safety. (See *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Mother's long term and recent drug usage, without effective drug treatment intervention, provided reason to believe that mother's drug usage will continue.

Mother further contends that Daisy was not harmed by her drug usage. Assuming arguendo that her statement is correct, it is, of course, not necessary for Daisy to be harmed before the juvenile court can step in to protect her. "The state, having substantial interests in preventing the consequences caused by a perceived danger, is not helpless to act until that danger has matures into certainty. Reasonable apprehension stands as an accepted basis for the exercise of state power." (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.) The facts presented to the court clearly indicate that the juvenile court's jurisdiction was warranted in the present case.

Father contends that there were not sufficient facts presented to the juvenile court for it to have found that: "The child's father, D[.]C[.] knew of mother's substance abuse and failed to protect the child. That mother's illicit drug abuse and the child's father's failure to protect the child endangers the child's physical health and safety and places the

7

child at risk of physical harm, and damage." Thus he should not have been found to have been an "offending party" for the purpose of determining section 300, subdivision (b) jurisdiction over Daisy.

The Department contends, however, having found that there was substantial evidence that mother's conduct caused Daisy to be a person described by section 300, subdivision (b), the court need not address the merits of father's claim that the juvenile court erred in sustaining allegations about his conduct. It is not necessary for both parents to be offending for the juvenile court to assert jurisdiction over a child. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) In support of its position it relies on *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492, wherein the court stated: "[I]t is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child. [Citations.] Once the child is found to be endangered in the manner described by one of the subdivisions of section 300, . . . the child comes within the court's jurisdiction . . . . As a result, it is commonly said that a jurisdictional finding against one parent is '"good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent."' [Citation.] For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found supported by the evidence. [Citation.]" We therefore decline to opine on Father's contentions in regard to jurisdiction.

2. *The disposition order*

The juvenile court made the following disposition order: "The child is hereby declared a dependent of the court under Welfare and Institutions Code Section 300, Subdivision (b). The court finds that by clear and convincing evidence pursuant to Welfare & Institutions Code Section 361(c) that there is a substantial danger if the child were returned to the custody of the parents to the physical health, safety and protection or physical or emotional well-being of the child, and there are no reasonable means by

8

which the . . . child's physical health can be protected without removing the child from the parent's custody. [¶] The court orders the [child] removed from the parents. Reasonable efforts were made to prevent and eliminate the need for the [child's] removal from the custody – of her parents. [¶] For placement, the court orders the care, custody, and control and conduct of the child to be placed under the supervision of the Department of Children and Family Services for suitable placement. [¶] The Department should consider keeping the child released to the maternal grandmother's home. The court would permit the mother to move into the grandmother's home, but the visits with the child do need to be monitored. So – and that can be the grandmother while she is home. She doesn't have to be in the same room, but she does need to be home at the same time. And if the grandmother is going to leave, then we would have to have caregivers that are approved by the Department."

After an interjection by counsel the court made the following correction to its order. "The mother has unmonitored visits living with the grandmother but should not be left alone by the grandmother with the child. And any babysitters that come into the home while the mother and the child are there should be assessed by the Department."

The standard of review on appeal from an order removing children from their custodial parents at a dispositional hearing is substantial evidence, bearing in mind the heightened burden of proof at the trial level of clear and convincing evidence. (*In re Kristin H., supra,* 46 Cal.App.4th at p. 1654.) A removal order is proper if it is based on proof of parental inability to appropriately care for the child, as well as proof of potential detriment to the child if he or she remains with the parent. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) There is no requirement that the parent is actually dangerous or that the child suffer actual harm prior to removal. The focus of the removal statute is on averting harm to the child. (*Ibid.*)

Mother's only argument regarding disposition was that the dispositional orders need to be reversed because the juvenile court erred in making its jurisdictional findings.

9

However, in view of this court's affirmance of the juvenile court's finding of jurisdiction based on mother being an "offending party," this challenge must be denied.

Father challenges the juvenile court's order, contending that it was improper because it was based on section 361, subdivision (c), while it should have been brought under section 361.2. Section 361, subdivision (c)(1) states in part: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following: (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."

The juvenile court "removed" Daisy from the custody of her father, pursuant to section 361, subdivision (c). Father contends that Daisy was not residing with father at the time that the section 300 petition was initiated. He has, in fact, never had physical custody of Daisy. Daisy was detained directly from the hospital and consequently never resided with either parent. Mother, however, as the undisputed biological mother of Daisy, was the person entitled to take Daisy home from the hospital; father was not. Though the acknowledged biological father, father was not married to mother and no evidence was presented that his name was listed on the birth certificate. Neither did the juvenile court identify him as the presumed father, though requested to do so by the Department. Because father had no custodial rights, the court could not remove Daisy from his physical custody. Consequently, the juvenile court should have proceeded under section 361.2 as to father and not pursuant to section 361, subdivision (c)(1).

Section 361.2, subdivision (a) states in part: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with

10

the parent unless if finds that placement with that parent would be detrimental to the safety, protection or physical or emotional well-being of the child."

Father and mother were residing together at the time that the events or conditions arose that brought the child within the provisions of section 300. Mother was in her ninth month of her pregnancy with Daisy, when she began ingesting marijuana and tested "dirty" on three occasions. Under California law, until a baby is born it is a fetus, not a child (see *Justus v. Atchison* (1977) 19 Cal.3d 564, 577) and therefore father was not residing with Daisy at the time that mother engaged in the conduct (ingesting marijuana) which led to the section 300 petition being filed. Further, there is no question but that father is the father of Daisy and desired custody of Daisy.

Assuming arguendo that father is correct and that the juvenile court's dispositional findings as to not releasing physical custody of Daisy to him were made pursuant to an incorrect code section, then the question is, was this error prejudicial? "Our state Constitution provides that '[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13) 'The effect of this provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the [party]. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal depends on the circumstances in each case.' [Citation.] The phrase 'miscarriage of justice' has a settled meaning in our law, having been explained in the seminal case of *People v. Watson* (1956) 46 Cal. 2d 818 (*Watson*). Thus 'a "miscarriage of justice" should be declared only when the court "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*Id* at p. 836.) 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a reasonable

11

chance, more than an abstract possibility.' [ Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

The relevant language in section 361, subsection (c)(1) and 361.2, subdivision (a) are almost identical. Section 361, subsection (c)(1) refers to a substantial danger to a child's physical health, safety or protection or physical or emotional well being, while section 361.2 refers to actions detrimental to the safety, protection or physical or emotional well being of the child. Therefore, a finding under section 361, subdivision (c)(1) would for all practical purposes be equivalent to a finding under section 361.2. Therefore, any error by the court in referring to the incorrect code section in making its findings as to whether father should have custody of Daisy was harmless and certainly would not constitute a miscarriage of justice.[2]

Removal decisions are reviewed according to the "substantial evidence" standard. (*In re Kristin H., supra,* 46 Cal.App.4th at p. 1654.) In juvenile cases, as in other areas of the law, the power of an appellate court begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier-of-fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict or judgment, if possible. Where there is more than one inference that can reasonably be deduced from the facts, the appellate court must not substitute its deductions for those of the trier of fact. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633; *In re Katrina C., supra,* 201 Cal.App.3d at p. 547.)

Even though the juvenile court finds a substantial danger to the physical health, or the physical or emotional well being of a child, removal (or denial of custody) should not be ordered if the child's safety can be ensured, within the discretion of the court, without depriving the parent(s) of the right to custody of the child. (§ 361, subsection (c)(1); *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171.) Section 361, subsection (c)(1) states in this

---

[2]    In view of the holding of this court, we will not discuss the Department's contention that section 361.2 is not applicable because the declaration signed by father was not properly served on the Department.

regard: "The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain the physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child form future harm." (*In re Kristin H., supra,* at p. 1652.)

The father contends that the juvenile court failed to make this determination and that there was in fact a viable alternative, that is, release with conditions. (See *In re Neil D.* (2007) 155 Cal.App.4th 219, 224.) He argues, for example, that the juvenile court could have released Daisy to father on the condition that he live with the paternal grandmother, order that his continued custody was contingent on his not ingesting marijuana, and to submit to random drug testing.

The court's findings in conjunction with its removal of Daisy from the custody of the parents were clear. It stated: "That there is a substantial danger if the child were returned to the custody of the parents . . . . And there are no reasonable means by which the . . . child's physical health can be protected without removing the child from the parents' custody."

A reading of the record clearly reveals that the juvenile court's concern for Daisy's welfare was based on the parents' history of drug use and father's present use of marijuana, and its concern that, despite well intentioned promises of drug abstinence by the parents, one or both of them could relapse. They also both had mental health issues.

A review of the record further reveals that the juvenile court seriously considered the issue of disposition. After reviewing all the reports, and hearing extensively from counsel, the court crafted its order. It was very liberal in granting "semi-custody" of the minor to the parents. While the court ordered that the care, custody, and control of Daisy was to be placed under the supervision of the Department, Daisy was allowed to remain with the maternal grandmother at her home and mother was allowed to live there as well. If, however, the maternal grandmother was to leave home without Daisy, then Daisy was required to be left with a caregiver approved by the Department. Father was given unmonitored visitation with Daisy at the time of the order, and then unmonitored overnight weekends based on the assessment of the Department, provided that the

13

paternal grandmother was at the home during the visitation. If not, then the visitation was required to be monitored by a child care provider approved by the Department. The court also ordered drug testing, a parenting class, a 12-step program, and individual counseling for the parents, and scheduled a progress report.

The juvenile court by its comments and the well crafted order it made clearly indicated that the parents may be at some point be able to take custody of Daisy, but due to the "drug issues" and mental health issues felt it premature to do so. It ordered drug testing, parenting classes, a 12-step program and individual counseling. The obvious reason for these requirements was to assure that the parents were no longer using drugs, had their mental and emotional problems under control and were able to take care of the infant. We cannot say that the juvenile court in making its disposition order abused its discretion. It properly carried out its function of protecting the minor while respecting the rights of the parents.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:


TURNER, P. J.                                        MOSK, J.

---

[*] Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14